# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 03-3785

INCREDIBLE TECHNOLOGIES, INC.,

*Plaintiff-Appellant,*

v.

VIRTUAL TECHNOLOGIES, INC. d/b/a GLOBAL VR,

*Defendant-Appellee.*

_____

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 03 C 1183—**Matthew F. Kennelly**, *Judge.*

_____

ARGUED SEPTEMBER 13, 2004—DECIDED MARCH 15, 2005

_____

Before BAUER, RIPPLE, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* As anyone who plays it knows, golf can be a very addicting game. And when real golfers want to tee-it-up, they head for their favorite course, which might be a gem like Brown Deer in Milwaukee, a public course that nevertheless plays host to an annual PGA Tour event every July. What most golfers do not do when they want to play 18 is head for a tavern. Also, most people are quite familiar with Tiger Woods. But who knows Jeff Harlow of Florissant, Missouri? This case is about "golfers" who prefer taverns to fairways and aspire to be more like Harlow than Tiger. Our case concerns video golf.

Golden Tee,[1] made by Incredible Technologies, Inc. (IT), is an incredibly successful video golf game, one of the most successful coin-operated games of all time, beating all kinds of classic games like PAC-MAN and Space Invaders. Forty thousand Golden Tee games (in a dedicated cabinet) were sold between 1995 and August 2003. The game can be found in taverns all over America and in other countries as well. IT spends millions on advertising, and the game generates huge profits in return.

Golden Tee is played by thousands, and the Harlow chap we mentioned, according to a November article in the *St. Louis Post-Dispatch*, just won the 3rd Annual Golden Tee World Championship in Orlando, Florida. Harlow pocketed $15,000 for the effort (not enough though, the paper reports, for him to give up his day job as a baker at a bagel factory). With money galore tied into the Golden Tee game, the people at IT, understandably, were not happy when PGA Tour® Golf, made by Virtual Technologies, Inc. (d/b/a Global VR), appeared on the tavern scene with a competing game. That's why we have before us IT's appeal from the denial of a preliminary injunction in its copyright/trade dress case against Global VR.

IT has been manufacturing the Golden Tee game since 1989 and has several copyrights on various versions of the game. Involved in this appeal are copyrights on the video game imagery presented on the video display screen and the instructional guide presented on the control panel. In addition, there is a claim that the PGA game's control panel infringes the Golden Tee's trade dress.

Golden Tee employs a software program which projects images and sounds through a video screen and speakers in a kiosk-like display cabinet. The images are of players and

---

[1] The version we will be discussing is Golden Tee Fore!, which IT started selling in February 2000.

golf courses. In front of the screen is a control panel with a "trackball" in the center, which operates the game. The "trackball" is a plastic white ball embedded on the game board. Approximately 1/4 of the ball is visible to the player. The rest of the ball is underneath the game board.

To play the game the trackball is rolled back for the golfer-player's back swing and pushed forward to complete the swing. As in real golf, the virtual golfer must choose the club to be used and, for an accurate shot, consider things like wind and hazards (indicated on the display screen) on the course.

Aware of Golden Tee's popularity, Global VR determined to create a game that was similar enough to Golden Tee so that players of that game could switch to its new game with little difficulty. It obtained a Golden Tee game and delivered it to NuvoStudios (Nuvo), the firm hired to develop the new game. NuvoStudios was instructed to design a game that dropped into a Golden Tee box to work with its controls, which should correspond as closely as possible to Golden Tee, so that a Golden Tee player could play the new game with no appreciable learning curve.

Nuvo worked from the existing software of a computer golf game—Tiger Woods Golf—and made modifications to convert from a game, played on personal computers and operated with a mouse, to an arcade game, operated as is Golden Tee, with a trackball and buttons. Nuvo essentially copied, with some stylistic changes, the layout of buttons and instructions found on the Golden Tee control panel. Global VR terminated Nuvo's services before the work on the new game was completed, but it hired key Nuvo personnel to finish the job. The goal of making it easy for Golden Tee players to play the new game remained.

The completed new game, PGA Tour Golf, is very similar to the Golden Tee game. The size and shape of PGA Tour Golf's control panel, and the placement of its trackball and buttons, are nearly identical to those of Golden Tee. The

"shot shaping" choices are depicted in a similar way and in the same sequence. Although the software on the two games is dissimilar, both allow a player to simulate a straight shot, a fade, a slice, a draw, a hook, etc. by the direction in which the trackball is rolled back and pushed forward. Although other games, such as Birdie King and Sega's Virtua Golf have used trackballs, Golden Tee claims to be the first to use both a backward and forward movement.

There are also significant differences between the two games. Golden Tee is played on make-believe courses and the player is given a generic title, like "Golfer 1." The PGA game, on the other hand, uses depictions of real courses, such as Pebble Beach and TPC at Sawgrass, and it permits a player to adopt the identity of certain professional golfers—Colin Montgomerie and Vijay Singh, to name a few. The cabinets are somewhat different, within the realm of what is possible in arcade game cabinets, and the games use different color schemes.

IT filed this lawsuit in February 2003. Its request for a temporary restraining order was denied, and after expedited discovery, a 6-day hearing was held on its request for a preliminary injunction. In denying the injunction, the district court found that Global VR had access to and copied IT's original instruction guide and the video display expressions from Golden Tee. But the court said that IT had not shown a likelihood of success on the merits of this lawsuit, in part because (1) IT's expressions on its control panel are not dictated by creativity, but rather are simple explanations of the trackball system; at best, they are entitled to protection only from virtually identical copying; (2) the video displays contain many common aspects of the game of golf; and (3) IT's trade dress is functional because something similar is essential to the use and play of the video game.

To obtain a preliminary injunction, a plaintiff must demonstrate a likelihood that it will prevail on the merits of the lawsuit, that there is no adequate remedy at law, and that it will suffer irreparable harm without injunctive relief. If

these requirements are met, the court must then balance the degree of irreparable harm to the plaintiff against the harm that the defendant will suffer if the injunction is granted. *Publications Int'l, Ltd. v. Meredith Corp.*, 88 F.3d 473 (7th Cir. 1996). On appeal, the decision granting or denying a preliminary injunction is reviewed for an abuse of discretion. A court has abused its discretion when it "commits a clear error of fact or an error of law." *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 13 (7th Cir. 1992). The district court's weighing of the factors is entitled to great deference. We do not substitute our judgment for that of the district court.

To establish copyright infringement, a plaintiff must prove "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). Copying may be inferred where the "defendant had access to the copyrighted work and the accused work is substantially similar to the copyrighted work." *Atari, Inc. v. North American Philips Consumer Elecs. Corp.*, 672 F.2d 607, 614 (7th Cir. 1982); *Warner Bros., Inc. v. American Broad. Cos.*, 654 F.2d 204 (2nd Cir. 1981). The test for substantial similarity may itself be expressed in two parts: whether the defendant copied from the plaintiff's work and whether the "copying, if proven, went so far as to constitute an improper appropriation." *Atari*, 672 F.2d at 614. Because it is pretty clear here that Global VR set out to copy the Golden Tee game, the second question comes closer to the issue we must face, and it leads us to the "ordinary observer" test: "whether the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectible expression by taking material of substance and value." *Atari*, 672 F.2d at 614. It seems somehow fitting that the *Atari* case, involving the insatiable little yellow circle PAC-MAN, is a leading case guiding us through the maze of copyright law as applied to video games.

In these games, an ordinary observer, seeing a golf game on the video display and a trackball to operate the game, might easily conclude that the games are so similar that the Global VR game must infringe the Golden Tee game. But because ideas—as opposed to their expression—are not eligible for copyright protection, *see Mazer v. Stein*, 347 U.S. 201 (1954), protection does not extend to the game itself. *Atari*, 672 F.2d at 615; *Chamberlin v. Uris Sales Corp.*, 150 F.2d 512 (2nd Cir. 1945). For other reasons, which we will soon discuss, protection does not extend to the trackball. It is clear, then, that the concept of the ordinary observer must be viewed with caution in this case, and we must heed the principle that, despite what the ordinary observer might see, the copyright laws preclude appropriation of only those elements of the work that are protected by the copyright. *Atari*, 672 F.2d at 614.

In fact, there are several specific limitations to copyright protection with some relevance to this case. One is the *scènes à faire* doctrine. The doctrine refers to "incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic." These devices are not protectible by copyright. *Atari*, 672 F.2d at 616. For instance, the mazes, tunnels, and scoring tables in Atari's PAC-MAN were *scènes à faire*.

In addition, the Copyright Act provides that copyright protection does not extend to any "method of operation . . . regardless of the form in which it is described, explained, illustrated, or embodied in such work." 17 U.S.C. § 102(b). The Court of Appeals for the First Circuit has declined to extend copyright protection to a set of commands for a computer program. Even if there are multiple methods by which an operation can be performed, a plaintiff's choice of a particular method of operation is not eligible for protection. *Lotus Dev. Corp. v. Borland Int'l, Inc.*, 49 F.3d 807 (1st Cir. 1995).

Useful articles and functional elements are also excluded from copyright protection. *American Dental Ass'n v. Delta Dental Plans Ass'n*, 126 F.3d 977 (7th Cir. 1997). A useful article is defined in the copyright act as "an article having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information." The design of a useful article is considered a "pictorial, graphic, or sculptural work only if, and only to the extent that, such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article." 17 U.S.C. § 101. The separability issue has caused considerable consternation. See our recent discussion in *Pivot Point International, Inc. v. Charlene Products, Inc.*, 372 F.3d 913 (7th Cir. 2004).

The exclusion of functional features from copyright protection grows out of the tension between copyright and patent laws. Functional features are generally within the domain of the patent laws. As we said in *American Dental*, an item may be entirely original, but if the novel elements are functional, the item cannot be copyrighted: although it might be eligible for patent protection,

> [a]n article with intertwined artistic and utilitarian ingredients may be eligible for a design patent, or the artistic elements may be trade dress protected by the Lanham Act or state law.

126 F.3d at 980.

That means that the elements of our two games, which are most significant and most clearly similar, are not before us. The trackball system of operating the game is not subject to copyright protection. Functional features, such as the trackball system, might, at least potentially might, be

eligible for patent protection.[2] *See American Dental Ass'n,* 126 F.3d 977. But that protection would be for a significantly shorter period of time than copyright protection. So the anomaly is that a party can conceivably obtain more significant protection for the relatively less significant aspects of its product. For instance, in this case we are concerned, not with the trackball system but with things such as whether arrows pointing to the direction a golf ball will fly are sufficiently original to merit protection under the copyright laws.

With this discussion out of the way, we move to the issues which are before us, as framed by IT. Those issues are whether the district court erred as a matter of law in creating a new "best explanation exception" to copyright protection; whether the district court erred as a matter of law in finding that the *scènes à faire* doctrine eliminated copyright protection for its video game expressions; and whether the district court erred as a matter of law in concluding that IT's trade dress in the control panel is functional. In discussing the issues, of course, we are concerned only with whether the district court abused its discretion in finding that IT did not have a likelihood of success of prevailing on the merits of its claims at trial.

IT first contends that the district court misunderstood how the trackball system works, which led it to commit a legal error in evaluating the control panel and instructions. As we said, to operate both games, the trackball is rolled back toward the player to effectuate the back swing of the golfer on the video screen and pushed forward to complete the down swing. Directions on the control panel show how to make various shots, such as a draw, a fade, etc., by

---

[2] However, as IT acknowledges, Golden Tee was not the first video golf game to use the trackball format, making a patent somewhat unlikely.

changing the angle at which the trackball is rolled back and forward. Nine specific shots are shown on the video display. The district court referred to "the" 9 different shot examples shown on the control panel. This, IT contends, shows that the district court thought that the 9 shots were the only possible shots when, in fact, subtle variations exist so that many more than 9 shots are available.

This fundamental misunderstanding, IT says, led the district court to a legal error. As IT puts it in a heading in its brief, the "district court erred as a matter of law in creating a revolutionary new 'best explanation' exception to copyright protection." The result of the new exception would be that the " 'best' physics textbook would have no copyright protection and could be freely copied, simply because it is the 'best.' " That argument certainly grabs one's attention: What was the district judge thinking?

As it turns out, we need not be hysterical about district judges creating random exceptions to the copyright laws. The district judge here, Matthew F. Kennelly, concluded that the instructions on the control panel were not creative expressions and that there was "no evidence in the record to suggest that IT considered anything other than how best to explain its trackball system when it designed the text and instructional graphics featured on Golden Tee." It is from this rather innocuous statement that IT says the judge created a wholly new exception. We disagree with that interpretation. In context, it seems clear that what the judge was saying is that while there arguably are more ways than one to explain how the trackball system works, the expressions on the control panel of Golden Tee are utilitarian explanations of that system and are not sufficiently original or creative to merit copyright protection. Furthermore, the judge said, to the extent they might be subject to a copyright, they would merit protection only against virtually identical copying.

What IT is talking about on the control panel are the following: a horizontal graphic which shows the trackball motions used to control the flight path of the ball and small indicating arrows above the graphic; three white buttons of the left side of the trackball and two buttons, one red, one white, on the right of the trackball; and the textual instructions in the bottom right corner. Undoubtedly, there is similarity between the two games in the instructions on the control panel as well as in the layout of the controls themselves.

As to the instructions, we cannot say that the district judge abused his discretion in finding that the element of creativity is slight and can be protected only against identical copying, which does not exist. The element of creativity in the instructions is less than minimal. Both games use arrows to indicate the direction in which to roll the trackball in order to obtain certain results. While it is possible that something other than an arrow could have been used to indicate direction, use of an arrow is hardly imaginative or creative in this situation. Also, the designs of the arrow surrounding the trackball differ significantly in the two games as do the graphics showing shot-shaping possibilities.

To a large degree, the layout of the controls seems to have been dictated by functional considerations. The trackball almost necessarily must be in the center of the control panel so that right- and left-handed players can use it equally well. It must not be so close to the upright video display that a player would smash her hand into the screen too forcefully after making a shot. Global VR claims that the buttons must be aligned across the center of the control panel for ease of manufacturing. We do not find an abuse of discretion in the district court's conclusions that the buttons appear to have been placed where they are for purposes of convenience and cannot be said to be expressive. We also note that on Golden Tee, the white button to the right of the trackball is labeled "backspin" and provides for just that; on

the Global VR game, the corresponding button is labeled "shot type" and provides for backspin and topspin.

IT also contends that the district court erred as a matter of law in finding that the *scènes à faire* doctrine applied to eliminate copyright protection for the video imagery. Global VR, of course, disagrees, although it acknowledges that, in an appropriate case, the imagery of a video arcade game may be protected by a copyright. However, Global VR argues that in this case the elements over which IT claims protection are inherent either in the idea of video golf or are common to the creation of coin-operated video games in general. The district court agreed and determined that many elements of the video display were common to the game of golf. For instance, the wind meter and club selection features were found to account for variables in real golf and so were indispensable to an accurate video representation of the game. Furthermore, the court said that the game selection features, such as the menu screens which indicate the number of players and other variables of the game, are common to the video-game format.

As we said, *scènes à faire* refers to incidents, characters, or settings which are as a practical matter indispensable, or at least standard in the treatment of a given topic. Looking again at *Atari*, we see that the court found that the game was primarily unprotectible:

> PAC-MAN is a maze-chase game in which the player scores points by guiding a central figure through various passageways of a maze and at the same time avoiding collision with certain opponents or pursuit figures which move independently about the maze.

*Atari*, 672 F.2d at 617. Certain expressive matter in the game was treated as *scènes à faire* and would therefore receive protection only from virtually identical copying. The court said that the "maze and scoring table are standard game devices, and the tunnel exits are nothing more than

the commonly used 'wrap around' concept adapted to a maze-chase game." *Atari*, 672 F.2d at 617. The use of dots to award points was also *scènes à faire*. The allegedly infringing game, K. C. Munchkin, had slight but sufficiently different versions of these items to preclude a finding of infringement. The court went on to find, however, that the concepts of the central figure as a "gobbler" and the pursuing figures as "ghost monsters" were wholly fanciful and thus subject to more protection. K. C. Munchkin had "blatantly similar features," giving Atari a likelihood of success of showing infringement.

In contrast, we see no error of law in Judge Kennelly's finding that the Global VR video display is subject to the *scènes à faire* doctrine. Like karate, *see Data East USA, Inc. v. Epyx, Inc.*, 862 F.2d 204, 209 (9th Cir. 1988), golf is not a game subject to totally "fanciful presentation." In presenting a realistic video golf game, one would, by definition, need golf courses, clubs, a selection menu, a golfer, a wind meter, etc. Sand traps and water hazards are a fact of life for golfers, real and virtual. The menu screens are standard to the video arcade game format, as are prompts showing the distance remaining to the hole. As such, the video display is afforded protection only from virtually identical copying.

Given that certain items are necessary to making the game realistic, the differences in the presentation are sufficient to make IT's chances of success on the merits unlikely. Global VR has "real" courses and "real" golfers; Golden Tee's courses are imaginary and its golfers generic. In the Global VR game, a golf bag appears on the screen as the player chooses a club for the shot he intends to play. Global VR offers a "grid" mapping the green as a guide for putting. Golden Tee has no such device. Also, the Global VR game has a helicopter that whirls overhead from time to time. Both games mimic condescending real television golf announcers, but the announcers use different phrases: "the

fairway would be over there" and "I don't think that's going to help a whole lot" in Global VR versus "That can only hurt," "You've got to be kidding," and "You can lead a ball to water but . . ." from the Golden Tee announcers. Judge Kennelly did not abuse his discretion on this point.

The trade dress claim requires little discussion. The term trade dress refers to the "appearance of a product when that appearance is used to identify the producer." *Publications Int'l, Ltd. v. Landoll, Inc.*, 164 F.3d 337, 338 (7th Cir. 1998). To prevail on a trade dress claim, IT must establish that its trade dress is nonfunctional, that it has acquired secondary meaning, and that a likelihood of confusion exists between the trade dress of the two games. *Computer Care v. Service Sys. Enters., Inc.*, 982 F.2d 1063 (7th Cir. 1992). Although IT frames the issue as involving only the control panel, both parties veer into a discussion of their cabinets. Of the cabinets, we will say only that they are somewhat similar in shape, but so are most arcade game cabinets. The shapes of the sides of the cabinets are different; the coloring is different. The sides of the Golden Tee cabinet are white, while the much less subdued PGA Tour cabinet is an intense blue. The only words or logos on the sides of the Golden Tee cabinet, set off in yellow, are "IT Incredible Technologies" in an upper corner and a circle with "G Fore T" printed inside. On the other hand, the Pro Tour cabinet has a good deal more going on. It starts with "Global VR Presents." Then there is a circle containing the words "EA Sports PGA Tour Golf." Below the circle are the words

> Real Courses
>
> Real Golfers
>
> Real Golf

all with the PGA Tour logo between the words. The PGA Tour logo, by the way, appears five times on each side of the cabinet.

As to the control panel, we see no error in the district court's conclusion that IT had no likelihood of success on this claim. The control panel and the trackball system are functional.

The Global VR game is emblazoned with the name EA Sports™ and PGA Tour® Golf logos. Its coloring is different and considerably bolder than that of the Golden Tee game. Golden Tee provides arrows to demonstrate its descriptions of the trackball system; Global VR does not. Global VR names the shots in its shot-shaping diagrams; Golden Tee does not.

IT argues, however, that the district court did not take into account what happens in the marketplace. IT says, "Bar and tavern patrons, often in dimly lit spaces, typically approach and play these video games while consuming alcohol; they are not consumers using high degrees of care in selecting, identifying, or differentiating the Golden Tee and PGA Tour games"! One wonders how different the control panels would have to be to avoid confusing such users. The decision of the district court denying IT's request for preliminary injunction relief is AFFIRMED.


A true Copy:

      Teste:


                            _____
                            *Clerk of the United States Court of*
                            *Appeals for the Seventh Circuit*