SOUTHWEST AIRLINES PILOTS' ASSOCIATION, Plaintiff,

v.

CITY OF CHICAGO; Ginger S. Evans, in her official capacity as Commissioner of the Chicago Department of Aviation; Tiffany L. Green, in her official capacity as Deputy Commissioner of Concessions for the Chicago Department of Aviation, Defendants.

No. 16 C 5117

United States District Court, N.D. Illinois, Eastern Division.

Signed 05/14/2016

Frank Busch, James M. Wagstaffe, Kevin Brooke Clune, Kerr & Wagstaffe LLP, San Francisco, CA, Stephen Anthony Yokich, Dowd, Bloch, Bennett, Cervone, Auerbach & Yokich, Chicago, IL, for Plaintiff.

Thomas P. McNulty, Diane M. Pezanoski, Ellen Wight McLaughlin, Fiona A. Burke, City of Chicago Department of Law, Chicago, IL, for Defendants.

## MEMORANDUM OPINION AND ORDER

Virginia M. Kendall, United States District Court Judge, Northern District of Illinois

Plaintiff Southwest Airlines Pilots' Association ("SWAPA") filed this action against the City of Chicago, Ginger Evans (the Commissioner of the Chicago Department of Aviation), and Tiffany Green (Deputy Commissioner of Concessions for the Chicago Department of Aviation) alleging violations of the First and Fourteenth Amendments arising from the CDA's re-

fusal to display an advertisement in Midway International Airport on one of the electronic dioramas in the terminal. The ad depicts a disgruntled Southwest Airlines pilot holding a sign that states "3.1 billion in profits/Pilot Raises $0." SWAPA seeks to have the ad displayed immediately, in anticipation of the May 18, 2016 meeting of the shareholders of Southwest Airlines. SWAPA now moves for a temporary restraining order allowing their advertisement to be displayed.[1] For the following reasons, SWAPA's Motion for Temporary Restraining Order [4] is granted.

## BACKGROUND

SWAPA is the sole bargaining unit for more than 8,000 Southwest Airlines pilots.

The CDA is a subdivision of the City of Chicago and administers all aspects of Chicago O'Hare and Midway International Airports. The CDA makes all final decisions regarding what advertisements may be displayed at these two airports.

On April 21, 2016, SWAPA sent Clear Channel—the CDA's advertising vendor for the airports—a proposed advertisement to be posted at Midway Airport. On April 22, Clear Channel responded on behalf of the CDA via email, stating that "the Ad was rejected ... it was [presented to] a few powered execs and they rejected it."

On April 22, 2016, SWAPA submitted the following revised version of the ad:

The CDA rejected the revised version that same day, stating, "[i]t was reasonable to reject this ad based on the potential for it to be disparaging, a public issue and potentially political in nature. Ultimately, per the guidelines the final decision is Tiffany [Green]'s to make and once made, that decision is final. You may refer SWAPA to Tiffany for her final decision and to the guidelines."

On May 2, 2016, SWAPA's president wrote a letter to the City of Chicago stating that the restriction violated the First Amendment. The City of Chicago responded, maintaining that it rejected the advertisement "based on the potential for it to

1. SWAPA does not mention its Fourteenth Amendment Equal Protection claim in its Motion for Temporary Restraining Order and the

Court therefore does not consider whether a TRO is appropriate on those grounds.

be disparaging, a public issue, and potentially political in nature." The letter stated that Tiffany Green made the decision and that Clear Channel communicated the decision in accordance with the CDA's Guidelines. Specifically, the CDA stated:

> The Ad does not fall within the description of permitted advertising content, because it is not commercial and promotional advertising, governmental advertising, a public service announcement, or advertising promoting the City and its airports, as those categories are defined in the Guidelines. Ex. B at § II.A.1-4. Moreover, the Ad falls specifically within three separate categories of prohibited advertising content. *Id.* at § II.B.1, 3, and 9. First, the Ad is prohibited by Section II.B.1 of the Guidelines, because it expresses the opinions of a trade union and is political in nature. *Id.* at § II.B.1. Second, the Ad is prohibited by Section II.B.3 of the Guidelines because it addresses a public issue, namely the opinions, positions, or viewpoint of SWAPA about economic and social issues, namely shareholder returns and pilot raises. *Id.* at § II.B.3. Third, the Ad is prohibited by Section II.B.9 of the Guidelines because it is intended to be, or reasonably could be interpreted as being, disparaging to a business, namely Southwest Airlines ("SWA"), as well as persons, namely SWA's shareholders. *Id.* at § II.B.9.

This lawsuit and motion for TRO followed.

## DISCUSSION

■ A TRO is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *See Goodman v. Ill. Dep't of Fin. & Prof'l Regulation,* 430 F.3d 432, 437 (7th Cir.2005) (quoting *Mazurek v. Armstrong,* 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997)). The standard for the issuance of a TRO is the same as that required to issue a preliminary injunction. *See Merritte v. Kessel,* 561 Fed.Appx. 546, 548 (7th Cir.2014). To obtain a preliminary injunction, the movant must demonstrate: (1) a likelihood of success on the merits, (2) that he or she will suffer irreparable harm absent injunctive relief, and (3) that he or she has no adequate remedy at law. *See Smith v. Executive Dir. of Ind. War Mem'ls Comm'n,* 742 F.3d 282, 286 (7th Cir.2014); *Incredible Techs., Inc. v. Virtual Techs., Inc.,* 400 F.3d 1007, 1011 (7th Cir. 2005). If the party seeking the TRO meets these requirements, then the Court must balance the harm that party will suffer without a TRO against the harm the other party would suffer should the Court grant the TRO. *See Incredible Techs.,* 400 F.3d at 1011. The Court must also consider the public interest in granting or denying an injunction. *See Ty, Inc. v. The Jones Group, Inc.,* 237 F.3d 891, 895 (7th Cir. 2001).

## I. Likelihood of Success on the Merits

■ To establish a likelihood of success on the merits, the movant must show that he has a "greater than negligible chance of winning." *AM Gen. Corp. v. Daimler-Chrysler Corp.,* 311 F.3d 796, 804 (7th Cir.2002). In determining whether SWAPA has any chance of prevailing on the merits of its free speech claim under the First Amendment, the court considers: (1) whether the speech is protected by the First Amendment; (2) if it is protected, the nature of its forum; and (3) whether the free speech restriction comports with the standard applicable to that forum. *See Cornelius v. NAACP Legal Def. & Educ. Fund,* 473 U.S. 788, 797, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). The parties dispute only the second two inquiries: the nature of the forum and the proper scrutiny of the speech restriction.

## A. Forum Analysis

Preliminarily, the Court finds—and the parties do not dispute—that the relevant forum is defined as the advertising space—specifically the display dioramas for the ads. *See Air Line Pilots Ass'n, Int'l v. Dept. of Aviation of City of Chicago*, 45 F.3d 1144, 1152 (7th Cir.1995) (finding that the advertising space in an airport, rather than the airport as a whole, was the proper focus of forum analysis). Having defined the forum, the Court must determine whether that forum is "public, either traditional or designated, or whether it is nonpublic." *See id.*; *Grossbaum v. Indianapolis-Marion County Bldg. Auth.*, 100 F.3d 1287, 1297 (7th Cir.1996). The parties agree that the forum in this case does not qualify as a traditional public forum, but the defense argues, and the CDA disputes, that the government has dedicated the advertising space for expressive uses as a designated public forum. *See Air Line Pilots*, 45 F.3d at 1152 (citing *Perry Educ. Ass'n v. Perry Local Educ. Ass'n*, 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983)).

Determining whether the ad dioramas have become a designated public forum requires an examination of the government's intent in establishing and maintaining the property. See *Air Line Pilots*, 45 F.3d at 1152. In evaluating the government's intent, the Court considers: (1) the policy and practice of the government with respect to the underlying property and (2) the nature of the property and its compatibility with expressive activity. *Id.* In order to make this determination, the Court looks to how the property has been used in the past and whether the government has had a consistent policy and practice regarding the forum's compatibility with expressive activity. *Id.* at 1152.

In past years, the CDA allowed advertisements on a wide range of issues, both commercial and non-commercial, including on topics that were clearly "public issues," "political," or "disparaging of businesses." Prior advertisements include a Samsung advertisement criticizing Apple products, an ad claiming climate change was responsible for the loss of the frog population in Yellowstone National Park and an ad discouraging visitors from staying at hotels in the City where union workers were striking. This permissive use could easily have been understood to create a designated public forum. *See Christian Legal Society v. Walker*, 453 F.3d 853, 865 (7th Cir.2006) (A designated public forum "is created when the government opens a nontraditional public forum for public discourse."); *Air Line Pilots*, 45 F.3d at 1156 ("if the diorama display cases have contained "political" or other public interest messages in the past, the City cannot now claim that those messages are incompatible with the purpose of the forum."); *Planned Parenthood Ass'n/Chicago Area v. Chicago Transit Authority*, 767 F.2d 1225, 1232 (7th Cir.1985) (bus advertising system had become a public forum because "CTA maintains no system of control over the advertisements it accepts for posting on its system").

Then, in August 2014, things changed. The CDA was confronted with an advertisement it found objectionable. The People for the Ethical Treatment of Animals Foundation ("PETA") sought to run an advertisement at O'Hare criticizing Air France for allegedly cruel treatment of monkeys shipped to their deaths in laboratories via O'Hare. The CDA found the advertisement "inconsistent with the purposes of its advertising program, and originally rejected it." PETA, however, threatened legal action. The CDA reviewed its policy and determined that it lacked any clear policies or procedures to limit the content of the subject advertising space and therefore ultimately chose to display the PETA advertisement. Recognizing

that it could not change its policy in relation to just that one ad, the CDA, correctly and professionally, chose to explore other policies in other cities that had been approved by Courts and regrouped to draft such a policy. In July 2015, the CDA issued a new set of advertising guidelines ("Guidelines") that restricted the content of advertisements, including the following content categories: political; religious; public issue; false or misleading information; violations of copyright or trademark law; illegal activity; profanity and violence; firearms; disparagement; unsafe transit behavior; tobacco; consumption of alcohol; and a variety of sexual and nudity content.

■ This change in policy, though swift and sweeping, is not without precedent. The nature of a forum is fluid and "the government is not required to retain the open character of a designated public forum indefinitely." *See Perry*, 460 U.S. at 46, 103 S.Ct. 948; *see also Am. Freedom Defense Initiative v. Mass. Bay Transp. Auth.*, 781 F.3d 571, 578 (1st Cir.2015) ("The forum question is not a static inquiry."). The CDA was entitled to change how it sought to use its advertising space and there is nothing in the record indicating this change was contrived to provide a *post hac* rationale for an existing advertisement. *Compare with Air Line Pilots*, 45 F.3d at 1153 (citing *Hays County Guardian v. Supple*, 969 F.2d 111, 117–18 (5th Cir.1992) (noting that "a general policy of open access does not vanish" given an "anomalous departure" in restricting speech)). On the contrary, the CDA—when faced with the objectionable PETA advertisement—allowed that advertisement to proceed precisely because it recognized its lack of established policies and procedures. The CDA was perfectly within its rights to change the policy in order to create a nonpublic forum by limiting the kinds of speech that can be presented in the ad dioramas.

SWAPA seeks to have the Court look at the policy and consistent application of the policy going back prior to the change in the Guidelines. Yet, the basic nature of the forum changed when the CDA issued its Guidelines in July 2015, and therefore the Court relies on context only from that point forward in evaluating whether the forum is a designated public forum or nonpublic forum. The parties agree that prior to July 2015 there was a broad range of advertisements and public use of the subject forum. To consider that permissive history in light of the significant shift in policy in July 2015, however, would be to ignore the dynamic nature of forums generally and the critical turning point in the life of this forum in particular.

The new Guidelines clearly establish the CDA's intent in using this forum. The purpose of the Guidelines is:

- to identify the types of advertising eligible for display at O'Hare and Midway International Airports;
- to maintain and enhance the reputation and public image of the City and CDA by avoiding advertising at O'Hare and Midway International Airports that is offensive or controversial, or is inconsistent with the City and CDA's image, policies, values, or mission; and
- to maximize revenue for supporting airport concessions.

To that end, the Guidelines detail three categories of "Permitted Advertising Content" and fifteen categories of "Prohibited Advertising Content." The Guidelines also set forth a process for submitting an advertisement for initial and final approval.

During oral argument, and in their briefs, the parties provided examples of three ads that have been approved since the enactment of the new July 2015 Guidelines. The approval of these ads, according to the CDA, shows a consistent policy. The first advertisement, was displayed by Pro-

ject Hope, and depicted a child with the message "Start saving lives NOW." According to the CDA, this ad was allowed under the Guidelines because it was a "public service announcement" by a nonprofit organization that related to the "prevention or treatment of illnesses." The second advertisement, by SWAPA, displayed a picture of smiling pilot holding a sign that said "Thank you for flying with us" and "Nothing is more important to us than you!" This was permissible under the Guidelines as "commercial and promotional advertising." The last ad, according to SWAPA, was put up by Southwest Airlines and promotes the fact that Southwest Airlines—unlike their competitors—does not charge baggage fees. The CDA permitted this ad under the new Guidelines as "commercial and promotional advertising."

The day after oral argument, the parties were invited to submit any other cases that they believed would support their respective positions. Along with the case law, SWAPA submitted an affidavit from one of their lawyers who had walked through O'Hare airport and who then sent in more examples of ads on display on that day. Recognizing that this new evidence had not been reviewed by the CDA, the Court gave the CDA an opportunity to respond in writing with its position on why each of those ads was approved under the new Guidelines. The CDA provided a response setting forth its reasons.

In its supplemental filing, SWAPA presented three World Wildlife advertisements on display at O'Hare Airport. One depicts a swimming turtle and states, "Be the voice for those who have no voice;" one features an elephant with large tusks and states, "I am not a trinket;" and the third shows a large fish and states, "Protecting the Future of Nature." The fish advertisement also includes the sentence, "WWF works around the world developing responsible fishing practices to protect marine populations from overfishing and ensure a catch that will feed fisherman, their families and you."

The CDA maintains in its response brief that these advertisements conform to the requirements for permitted advertising in Section II.A. of the Guidelines. (See Dkt. No. 21, 1–2). According to the CDA, each is a public service announcement of a nonprofit organization and therefore is permissible. The next ad that SWAPA presented that is currently on display at O'Hare Airport depicts United States armed service members and states, "Help Us Keep the Promise to America's Veterans." The CDA similarly approved this ad as a public service announcement from a non-profit organization.

So the question becomes, is the CDA consistently applying its guidelines? There is no question that the CDA attempted to create a nonpublic forum and limit speech according to that new policy and believed it was doing so. In applying its policy, it has prohibited the ad of the disgruntled pilot holding the sign depicting the facts that Southwest Airlines is making a significant profit and that its pilots have not received a wage increase while allowing the nonprofit ads to be displayed. Unfortunately for the CDA, they have ended their inquiry at Guideline II.A.1-4 and have not reviewed the non-profit ads for Guideline II.B.3. It is true, that the non-profit ads are ads that fit within the permissible category of public service announcements, but what is not as clear, is whether the are ads prohibited by Section II.B.3 of the Guidelines because they addresses a public issue, namely the opinions, positions, or viewpoint of the non-profit about economic and social issues.

Take as an example, the ad regarding the preservation of Africa's wildlife. Certainly, the majority of individuals who look at the ad would most likely deem it to be

an admirable cause and not subject to debate. Regardless, it takes a public position that one should not purchase ivory and it seeks to present this position from its viewpoint. There are potential other viewpoints to this ad, whether one is in agreement with them or not, including whether licensed hunting in Africa benefits the economy more than the restriction on hunting Africa's big game [2]; whether there is an adverse impact on many Asian communities who value ivory in their culture and use it for alleged medicinal purposes [3]; and whether the ban on sale of ivory will help the African economy because without it the loss of tourism will significantly harm the economy of Africa [4]. Whether the viewer espouses any of these positions is not the point; the issue is whether the ad is addressing a public viewpoint on social or economic positions. It can be argued that is does. If so, then those ads did not receive the same scrutiny that the SWAPA ad received.

Take another example of the wildlife protection of marine life ad. Although again, most viewers would accept the ad as a non-profit ad that is banal in its presentation, there are other contradictory viewpoints that may include the expense of protecting marine life at the harm of local economics, including development of land near the marine life and commercial fish-ing.[5] The ad touches upon a social and economic issue, and takes a viewpoint.

Even the ad regarding the support of veterans proposes a viewpoint on a social and economic issue. Admittedly, the average viewer of the ad would find it to be admirable, but it is still open to other viewpoints such as the type and kind of benefits a state should provide, or cut, during times of economic austerity. Regardless, it is an ad on a social issue that pertains to the economy and was only scrutinized as a non-profit ad. The CDA can certainly create a policy that protects the display of these ads and permits them to be displayed while legally restricting certain types of speech; but it has not done so with the language it adopted in the new policy and in the divergent way it has reviewed those ads in comparison to the SWAPA ad.

The issue is not whether each of these ads is permitted under Section II.A., but whether each may also be prohibited under Section II.B. By the express terms of the Guidelines, advertisements are only permitted under Section II.A. to the extent they do not violate Section II.B. (*See* Dkt. No. 4–3). And, in this case, all four of the advertisements listed above display public messages on social and economic issues.

▊ At its heart, the problem with the new Guideline is that it is too vague and

**2.** *See, e.g.,* http://news.nationalgeographic. com/news/2007/03/070315-hunting-africa. html; http://www.ifaw.org/united-states/news/ new-report-economics-trophy-hunting-africa-are-overrated-and-overstated; http://www. voanews.com/content/does-trophy-hunting-save-south-african-wildlife/2406005.html

**3.** *See, e.g.,* http://www.pbs.org/wnet/nature/ rhinoceros-rhino-horn-use-fact-vs-fiction/ 1178/; https://www.kcet.org/food/the-myths-of-medicinal-ivory; http://www.theatlantic.com/ business/archive/2012/09/what-is-it-about-an-elephants-tusks-that-make-them-sovaluable/ 262021/; https://africacheck.org/reports/

medical-claims-for-rhino-horn-youre-better-on-an-aspirin-orbiting-your-nails/

**4.** *See, e.g.,* http://www.theguardian.com/ environment/2014/feb/06/does-destroying-ivory-save-elephants; http://www.globaltimes. cn/content/924590.shtml

**5.** *See, e.g.,* http://news.nationalgeographic. com/news/2014/09/140920-pacific-remote-islands-marine-monumentocean-conservation/; https://news.vice.com/article/ ocean-sanctuary-threatens-maori-constitutional-rights-say-new-zealand-indigenous-leaders

can be applied arbitrarily. The terms contained in the definition of "public issue" include "economic, political, religious, or social issues." A general restriction on "political" speech is allowed in nonpublic fora, *see Int'l Society for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992); *Lehman v. City of Shaker Heights*, 418 U.S. 298, 304, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974). At least one court, under different circumstances, has determined that "economic" and "religious" issues may also be understood by persons of reasonable intelligence. *See, e.g., Women's Health Link, Inc. v. Fort Wayne Public Transportation Corp.*, 155 F.Supp.3d 843, 853–54, 2016 WL 67288, at *8 (N.D.Ind.2016) (finding restriction on advertisements that advocate opinions on "political, religious, or moral issues" not unconstitutionally vague). This Court, however, questions whether "social issues" and "economic" issues are so easily understood or differentiated in this instance. *See Air Line Pilots*, 45 F.3d at 1153, n. 5 (noting "taste" and "morality" are examples of standards too vague to be enforced). Moreover, and more importantly, the way that the CDA is interpreting those terms differs depending on the message in the ad. It is permissible in the eyes of the CDA to display ads that may have differing viewpoints on non-profit issues that the majority of viewers would find to be acceptable; but not to allow a differing viewpoint on what the CDA deems to be unacceptable—disgruntled pilots who want a raise. By not consistently applying its Guidelines, the CDA risks changing its intended non-public forum to a public forum where the Court must apply strict scrutiny. Applying that standard dooms the CDA's efforts to prohibit the ad.

For its policy to survive, the CDA must show a consistent policy of limiting access to its advertising space to those advertisements that conform to its written policy." *See United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 353 (6th Cir.1998) (citing *Planned Parenthood of Southern Nev., Inc. v. Clark County Sch. Dist.*, 941 F.2d 817, 823–24 (9th Cir.1991) (school district did not intend to open its publications for indiscriminate use where school district's policies explicitly reserved the right to control content of school publications, including advertisements, and school district's practices were not inconsistent with these policies); *see also Seattle Mideast Awareness Campaign v. King County*, 781 F.3d 489, 498 (9th Cir. 2015) ("[T]he County has consistently rejected proposed ads that fail to comply with the bus in violation of its policy,' the County 'evidenced its intent not to create a designated public forum.").

■ The CDA's stated policy, by itself, "is not dispositive with respect to the government's intent in a given forum." *Air Line Pilots*, 45 F.3d at 1153. The Guidelines have been enforced since July 2015 arbitrarily because the CDA has allowed messages on social and economic issues to be displayed but has denied SWAPA's message. By permitting public service announcements addressing public positions on social and economic issues while disallowing SWAPA's ad addressing a social and economic issue, the CDA has failed to consistently enforce its policy. On this record, the Court is unable to conclude that the CDA adopted "a policy of selective access for individual speakers rather than allowing general access for an entire class of speakers." *United Food & Commercial Workers Union*, 163 F.3d at 350 (citing *Arkansas Educ. Television Comm'n*, 523 U.S. 666, 679, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998)); *see also DeBoer v. Vill. of Oak Park*, 267 F.3d 558, 566 (7th Cir.2001) ("[T]he more selective the government is in restricting access to its property, the more likely that the property will be con-

sidered a nonpublic forum."). Accordingly, the CDA's efforts since July 2015 fall short of what would have been necessary to create a nonpublic-forum status by allowing and disallowing public speech on social and economic issues. *See, e.g., Entm't Software Ass'n v. Chicago Transit Auth.*, 696 F.Supp.2d 934, 945 (N.D.Ill.2010) (finding CTA's advertising guidelines insufficient to create a nonpublic forum).

## B. Reasonableness & Viewpoint Discrimination

■ Even if this Court were to determine that the CDA maintained its nonpublic forum and applied lower scrutiny to its review, the CDA's power to reserve a forum for certain groups or for the discussion of certain topics," *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995), is not unlimited. "The restriction must not discriminate against speech on the basis of viewpoint and the restriction must be reasonable in light of the purpose served by the forum." *See Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106, 121 S.Ct. 2093, 150 L.Ed.2d 151 (internal quotation marks and citations omitted).

The distinction between a permissible subject matter restriction and impermissible viewpoint discrimination is "not a precise one." *Rosenberger*, 515 U.S. at 829, 115 S.Ct. 2510. "The restrictions in the [CDA] policy are content-based, *see Reed v. Town of Gilbert*, —— U.S. ——, 135 S.Ct. 2218, 2227, 192 L.Ed.2d 236 (2015), but the advertising space in this case if viewed as a nonpublic forum, would only need a reasonable content-based restriction.' *Id.* at 829–830, 115 S.Ct. 2510. *See also Choose Life Illinois, Inc. v. White*, 547 F.3d 853, 865 (7th Cir.2008)." *See, e.g., Women's Health Link, Inc.*, 155 F.Supp.3d at 851–52, 2016 WL 67288, at *7.

The CDA claims that no other viewpoint against the disgruntled pilot ad has been displayed so it is not possible to say that the CDA is suppressing the pilot's viewpoint. SWAPA contends that the CDA give preferential treatment to public service announcements with which it agrees and governmental advertising on public issues. SWAPA's analysis is more apt an attack on whether CDA has treated the forum consistently than an attack on the viewpoint neutral argument. Regardless, the CDA had no problem displaying the happy Southwest Airline ad promoting the city and the airline. Yet, when the pilot displayed facts regarding pay, the CDA refused the message. It is not unreasonable to see the first ad as one which supports Southwest Airlines and its treatment of its pilot employees since it is the pilot who grins widely while greeting those entering the city—clearly showing a happy employee of the airline, an employee satisfied with his position with Southwest; while viewing the second ad as the depiction of an unhappy employee of the airline. The suppression of the second ad is to suppress the viewpoint of the unhappy employee of the airline while previously allowing the ad that depicts a satisfied employee. The only remaining distinction is the lack of a pay raise and therefore the job satisfaction displayed in the acceptable ad is a viewpoint the CDA allowed while rejecting the job dissatisfaction ad tied to pay. Because the CDA has both inconsistently applied its new guidelines to ads that have been displayed since July 2015, and because the CDA has suppressed an ad based on a viewpoint, the Court finds SWAPA has demonstrated a likelihood of success on the merits.

## II. Irreparable Harm and Inadequate Remedy at Law

To establish irreparable harm, SWAPA must demonstrate "that irreparable injury is likely in the absence of a [TRO]." *See Winter v. Natural Res. Def. Council, Inc.*,

555 U.S. 7, 22, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). The threat of irreparable injury necessary to justify a TRO "must be 'real,' 'substantial,' and 'immediate,' not speculative or conjectural." *See, e.g., Ditton v. Rusch*, No. 14 C 3260, 2014 WL 4435928, at *3 (N.D.Ill. Sept. 19, 2014) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983)). In this case, "[t]he loss of First Amendment Freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). And, "injunctions protecting First Amendment freedoms are always in the public interest." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir.2006).

 Moreover, SWAPA will suffer immediate, irreparable harm without entry of a TRO as they are seeking to display the advertisement in anticipation of the May 18, 2016 meeting of the Southwest Airlines shareholders where "crucial decisions regarding the pilot's compensation are made." (Dkt. No. 4–1 at 15). There is no adequate remedy at law as "an eventual award of money damages would not satisfy" SWAPA's injury, *i.e.* the inability to speak directly to the shareholders through its advertisement, particularly as the harm is likely unquantifiable. *AM Gen. Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 831 (7th Cir.2002).

The only interest the CDA appears to have is in impermissibly discouraging the promotion of SWAPA's position on a public issue. "While the law is free to promote all sorts of conduct in place of harmful behavior, it is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government." *Hurley v. Irish–American Gay, Lesbian, and Bisexual Group of Boston*, 515 U.S. 557, 579, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995).

The balance of equities weighs in favor of issuing the TRO.

The Court grants Plaintiff's motion for temporary restraining order and directs the CDA to allow the ad to be displayed. The Court recognizes that the distinction between the display of permissible and impermissible speech is not a precise one and the significance of the issue on the parties, and therefore will entertain a stay of this order for 12 hours if the CDA seeks to appeal the issue. If the CDA informs the Court that this is their intent, the Court will certify the issue for immediate appeal. If the CDA does not seek an immediate appeal, this order shall take effect 5/15/16 at 5:00 a.m.

## CONCLUSION

Southwest Airlines Pilots' Association's Motion for Temporary Restraining Order [4] is granted.