RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0039p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

PREMIER DEALER SERVICES, INC.,

                *Plaintiff-Appellee*,

    *v.*

ALLEGIANCE ADMINISTRATORS, LLC,

                *Defendant-Appellant*.

No. 23-3394

─────────────────

Appeal from the United States District Court for the Southern District of Ohio at Columbus.
No. 2:18-cv-00735—Edmund A. Sargus, Jr., District Judge.

Argued: February 1, 2024

Decided and Filed: February 26, 2024

Before: SUTTON, Chief Judge; CLAY and BLOOMEKATZ, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Andrew E. Samuels, BAKER & HOSTETLER LLP, Columbus, Ohio, for Appellant. Scott R. Thomas, HEMMER WESSELS MCMURTRY PLLC, Ft. Mitchell, Kentucky, for Appellee. **ON BRIEF:** Andrew E. Samuels, BAKER & HOSTETLER LLP, Columbus, Ohio, for Appellant. Scott R. Thomas, HEMMER WESSELS MCMURTRY PLLC, Ft. Mitchell, Kentucky, Gregory J. Krabacher, EPSTEIN BECKER GREEN, Columbus, Ohio, for Appellee.

─────────────────

## OPINION

─────────────────

SUTTON, Chief Judge. Premier Dealer Services competes with Allegiance Administrators to manage car dealers' loyalty programs, an arrangement used to service cars after the dealer sells them. The terms and conditions of the programs appear on loyalty

certificates that dealers use to enroll buyers. When Allegiance obtained the account of a former Premier client, it incorporated Premier's Lifetime Powertrain Loyalty Program certificates into its own plan. Premier sued Allegiance for using its copyrighted certificates. The district court held that Allegiance infringed Premier's copyright, ordered Allegiance to disgorge any profits from using the certificates, and awarded Premier attorney's fees. We affirm.

## I.

A car dealer's business usually does not end when a customer leaves the lot. Buyers need to service their vehicles over time, and dealers like to capture this cradle-to-grave business. "Loyalty programs" satisfy both goals by providing the buyer a place to service the car and by giving the seller the business. Unlike the warranties provided by manufacturers and the service contracts that car owners must purchase out of pocket, car dealers offer loyalty programs for free to capture this repeat business. A loyalty program contains two components. In one direction, car buyers must continue to pay dealers for oil changes, tire rotations, and other routine maintenance at intervals spelled out in the plan. In the other direction, if a covered part turns defective, the plan requires the dealer to cover the cost to repair or replace it.

This case concerns one such plan, the Lifetime Powertrain Loyalty Program. Premier Dealer Services, a developer and administrator of automobile dealers' aftermarket products, created the plan. As with most of these plans, the dealer promises to repair defects in a car's engine and transmission as long as the owner brings the vehicle to the dealer for required maintenance. Car dealers purchase access to the program from Premier and give it away as a promotion. When an owner brings a car back to the dealer for a powertrain repair, for example, the dealer initiates a claim by contacting Premier. Premier verifies that the plan covers the claim and that the owner has performed all required maintenance at the dealership. Once Premier approves the claim, the dealership sends an invoice to Premier, which pays the claim.

As part of the program, Premier designed a loyalty certificate for dealers to provide to car owners. The two-page certificate collects the owner's personal information and sets out the Program's terms and conditions. Premier created this certificate in 2008 and registered it for

copyright protection in 2012. That same year, it also registered a second certificate, largely the same as the first. A copy of that certificate appears as Appendix A to this opinion.

In 2008, Premier sold access to the program to Tricor Automotive Group, a Canadian corporation that develops dealership programs on behalf of approximately 250 dealer-owners. Tricor marketed the program to its members under its own brand and trained them on its operation. Premier received $40 (in Canadian dollars) every time a dealer provided a certificate to a car buyer in exchange for administering the program. As part of the agreement, Premier modified its copyrighted loyalty certificate for Tricor's Canadian market. It made cosmetic changes such as replacing miles with kilometers and states with provinces, but it otherwise left the terms the same. Tricor's contract with Premier acknowledged that the form belonged to Premier and could not be disclosed or sold to anyone.

In 2018, after a decade of working with Premier, Tricor hired Allegiance to administer its aftermarket programs, including the Lifetime Powertrain Loyalty Program. Allegiance checked whether its new client needed a loyalty certificate. Tricor replied that it would continue to use its existing Lifetime Powertrain Loyalty Program certificates and provided Allegiance with a copy. Allegiance noticed that the certificate listed a website and American P.O. box and asked whether it belonged to another company. Tricor's representative explained that Premier previously administered the program and that Allegiance should insert its own information. Allegiance substituted its contact information and kept the remainder of the certificate the same. The first page of that certificate appears as Appendix B to this opinion. Allegiance, like Premier, received $40 Canadian every time a dealer issued a certificate.

Premier sued Allegiance for infringing the copyrighted certificate. The district court granted summary judgment to Premier, reasoning that the certificate's "dull" subject matter did not preclude it from being original or from otherwise obtaining copyright protection. R.128 at 19–22. After a bench trial on damages, the court awarded Premier $441,239 of Allegiance's profits and enjoined Allegiance from infringing the copyright. The court awarded Premier $577,736 in attorney's fees.

II.

*Copyright protection.* The Constitution allows Congress to grant authors exclusive copyrights over their works. U.S. Const. art. I, § 8, cl. 8. The copyright statute extends this protection to "original works of authorship fixed in any tangible medium of expression." 17 U.S.C. § 102(a). If an author registers a copyright within five years of its first publication, it receives a statutory presumption of validity. *Id.* § 410(c); *see RJ Control Consultants, Inc. v. Multiject, LLC*, 981 F.3d 446, 454 (6th Cir. 2020). Any copying of original materials counts as infringement. *See Varsity Brands, Inc. v. Star Athletica, LLC*, 799 F.3d 468, 476 (6th Cir. 2015). One way to rebut the presumption of validity is to show that the work is not original. *See id.*

Originality has a low threshold, requiring only that the author "independently created" a work with "some minimal degree of creativity." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 345 (1991). Authors fulfill originality's requirement of minimal creativity by making "non-obvious choices" from "among more than a few options." *ATC Distrib. Grp., Inc. v. Whatever It Takes Transmission & Parts, Inc.*, 402 F.3d 700, 707 (6th Cir. 2005) (quoting *Matthew Bender & Co. v. W. Publ'g Co.*, 158 F.3d 674, 682 (2d Cir. 1998)). The author's choices must evince some "inventiveness and imagination," *Hiller, LLC v. Success Grp. Int'l Learning All., LLC*, 976 F.3d 620, 627 (6th Cir. 2020), but not necessarily artistic merit, *see Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 251–52 (1903). Alongside choices about style and setting, this creative spark may arise from decisions about what materials to include and how to organize them. *See ATC Dist.*, 402 F.3d at 711–12 & 711 n.7; *Ross, Brovins & Oehmke, P.C. v. Lexis Nexis Grp.*, 463 F.3d 478, 484 n.3 (6th Cir. 2006); *see also Experian Info. Sols., Inc. v. Nationwide Mktg. Servs. Inc.*, 893 F.3d 1176, 1184–85 (9th Cir. 2018) (selecting, arranging, or coordinating facts may be creative).

Most works will satisfy this low standard of creativity, no matter how humdrum the subject matter. *Feist*, 499 U.S. at 345. Consider a few recent examples. A testing company evinced sufficient creativity in its workforce-development technical manuals by choosing to divide such skills as "Reading for Information" into subskills and arranging them by skill level. *ACT, Inc v. Worldwide Interactive Network, Inc.*, 46 F.4th 489, 500–02 (6th Cir. 2022). A guide for training HVAC technicians satisfied this requirement because its author made such creative

choices as delineating four steps to prepare for service calls and including fill-in-the-blank problems. *Hiller*, 976 F.3d at 626–27. Physician credentialing forms proved sufficiently creative by eliminating some of the questions that competitors asked and rearranging others in a unique way. *S. Credentialing Support Servs., L.L.C. v. Hammond Surgical Hosp., L.L.C.*, 946 F.3d 780, 783–84 (5th Cir. 2020).

This modest threshold comes with at least three qualifications. One is that copyright protection does not extend to facts that already exist in the world, even if no one has discovered or published them. *Feist*, 499 U.S. at 347; *see* 17 U.S.C. § 102(b); *see also Mazer v. Stein*, 347 U.S. 201, 217 (1954) (distinguishing copyrights from patents). A copyright extends only to an author's original expression of those facts, such as their selection, ordering, and arrangement. *Feist*, 499 U.S. at 347–48. So it is that an author may not obtain a copyright with respect to the unyielding principles of arithmetic or the physics of gravity. But the author may obtain a copyright in a math or physics textbook with respect to its problems and answer keys. *Baker v. Selden*, 101 U.S. 99, 103–04 (1879). The author of an autobiography may not obtain copyright protection over the facts of his life. But he may protect the way he describes them in his memoirs. *See Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 563–64 (1985).

A second qualification, known as merger, arises when there is only a single way to express a given set of facts. *Kohus v. Mariol*, 328 F.3d 848, 856 (6th Cir. 2003); *see generally* 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.03[B][3] (2024). If copyright protection extended to those expressions, the first author to create a work would prevent others from expressing the underlying idea. *See Murray Hill Publ'ns, Inc. v. Twentieth Century Fox Film Corp.*, 361 F.3d 312, 318 n.2 (6th Cir. 2004). Consider the example of a company deciding where to list a new part in its catalog. The only way for it to express the idea that the part belongs to a certain category—say, gaskets and not sealing rings—is to list it under that category. *ATC Dist.*, 402 F.3d at 707. Copyright law does not impede other companies from expressing that idea by listing the part in an identical way. *Id.* at 707–08.

A third qualification, the one directly at issue today, is known as "scenes a faire"— settings, in other words, that must be done. *Cain v. Universal Pictures Co.*, 47 F. Supp. 1013, 1017 (S.D. Cal. 1942) (Yankwich, J.) (coining this phrase to describe this aspect of copyright

law). Scenes a faire arise when the expectations of an industry or subject matter require an author to express facts in a certain way, rendering only a few choices "feasible in that setting" even if alternatives theoretically remain. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 538 (6th Cir. 2004)*, abrogated on other grounds by eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 392–94 (2006); *see Ross*, 463 F.3d at 485. The author's choice to select the obvious approach over less functional alternatives does not qualify as minimally creative. *See ATC Dist.*, 402 F.3d at 711–12. In determining whether an industry's standards and practices tolerate sufficient creativity in the expression of facts, expert testimony "is desirable, if not required." *RJ Control*, 981 F.3d at 458; *see Lexmark*, 387 F.3d at 539–40 (evaluating dueling expert reports about the feasibility of software alternatives); *see also Feist*, 499 U.S. at 363 (citing industry association's amicus brief about standards).

Take the white pages section of what once occupied a central place in every home: a three-dimensional phonebook. It collects the facts of residential telephone numbers and addresses and expresses them alphabetically by the last name of the homeowner. The phonebook could have chosen a different expression for those facts by, say, grouping them by street name. *See Feist*, 499 U.S. at 358, 362–63. But alphabetical order has become "so commonplace that it has come to be expected as a matter of course" and is "practically inevitable." *Id.* at 363. This expected expression of the facts, as a result, falls short of even the "*de minimis* quantum of creativity" required for copyright protection. *Id.*

Measured by these guidelines and requirements, Allegiance's challenge to the originality of Premier's copyright falls short. Premier registered its loyalty forms for copyright within five years of first using them by filing them in the U.S. Copyright Office located in the Library of Congress. They thus presumptively receive copyright protection unless Allegiance rebuts the presumption that Premier possesses a valid copyright.

What, one might initially wonder, are these automobile loyalty certificates doing in the Library of Congress? Surely this is not what Samuel Johnson had in mind when he said, "The chief glory of every people arises from its authors." 1 Samuel Johnson, *A Dictionary of the English Language* x (1755). Probably not. But the long-accepted policy of the copyright laws is

that they protect all manner of works—mundane and lofty, commercial and non-commercial, even the dull and workaday—so long as they satisfy the modest imperatives of originality.

The loyalty certificates amount to original expression under this test. They are "original to the author," *Feist*, 499 U.S. at 345, because Premier designed them "in-house" and "independent of forms used by competitors," R.101-1 at 8. And they presumptively possess a "minimal creative spark," *Feist*, 499 U.S. at 363, by showing some "inventiveness and imagination," *Hiller*, 976 F.3d at 627. The copyright covers a particular auto maintenance program, the customized expression and organization of which places the certificates beyond the kinds of highly abstracted descriptions typical of uncopyrightable facts and ideas. *See Kohus*, 328 F.3d at 855. The run-of-the-mine subject matter of the certificates does not detract from Premier's creative choices in crafting them. To see why, compare the organization of Premier's certificates to the rival certificates that Allegiance included in the record and that we have included as Appendix C. Premier's certificates include a distinct section on eligibility that covers different categories of required maintenance, including a selection of different mileage options between required oil changes. The other form lacks a distinct section on eligibility or maintenance, and it provides a single oil change standard above the signature line. Premier's offering of a menu of different mileage options, together with its choice to arrange the form with that section, evinces more creativity than simply moving headers or rearranging identical sections. *See ATC Dist.*, 402 F.3d at 711; *cf. S. Credentialing*, 946 F.3d at 784 (reasoning that the "distinctive arrangement" of business rivals' competing forms shows originality).

The content of these certificates also expresses the idea of covering damage to a car in different ways. Premier's certificates define several categories of covered parts, some of which depend on whether the part suffered damage resulting from "mechanical failure to an internally lubricated part." R.100-1 at 3. The other company lists different parts under the single heading of "Engine" and offers to expand coverage to other components in the event of "mechanical failure . . . caused by the above-listed parts." R.101-7 at 4. Choices about how to select and group categories and subcategories suffice to establish creativity. *See ACT*, *Inc.*, 46 F.4th at 500–02 (finding skill and subskill classification and arrangement minimally creative).

The juxtaposition between Premier's creative expression in the body of the certificates and the unoriginal top half of the front page, which merely provides spaces for the dealer to record the car buyer's information, helps to illustrates the originality of the body of the certificates. *See* 37 C.F.R. § 202.1(c) (excluding blank forms from copyright). Premier had some choices over what information to request—such as by asking for the vehicle purchase date and odometer reading, but not its color—but such categories prove obvious in the automotive context and required no creative spark to select. *See Utopia Provider Sys., Inc. v. Pro-Med Clinical Sys., L.L.C.*, 596 F.3d 1313, 1322–24 (11th Cir. 2010); *see also Kregos v. Associated Press*, 937 F.2d 700, 708–09 (2d Cir. 1991) (distinguishing uncopyrightable blank forms that use obvious headings from copyrightable forms whose headings satisfy originality). The remaining three-quarters of the certificates, however, go beyond such obvious information collection to provide details about the workings of the program itself. *See M.M. Bus. Forms Corp. v. Uarco, Inc.*, 472 F.2d 1137, 1139 (6th Cir. 1973).

The doctrines of uncopyrightable ideas, merger, and scenes a faire do not excuse Allegiance's imitation. Premier's certificate expresses the idea of a particular type of loyalty program, and comparison of Premier's form to the others in the record shows that companies can choose different ways to express that idea. The record also lacks any evidence about external constraints on the expression of these loyalty certificates. At summary judgment, Allegiance did not submit any testimony or affidavits from industry insiders or expert witnesses that car owners or dealers expect these forms to look a certain way or to include the same terms or conditions. *See Kohus*, 328 F.3d at 856 (explaining that external considerations include "standard industry practices" and professional organization standards).

Allegiance, last of all, copied the certificates. This case presents "rare[]" direct evidence of copying, *Fogerty v. MGM Grp. Holdings Corp., Inc.*, 379 F.3d 348, 352 (6th Cir. 2004), as no one in the case disputes.

All elements considered, the district court correctly ruled that Allegiance violated Premier's copyright in the loyalty program certificates.

Allegiance tries to counter this conclusion in several ways. It maintains that the district court mistakenly reasoned that originality always trumps the scenes a faire doctrine. But that is not what the district court said or did. It recognized that Premier's timely copyright registration shifted the burden to Allegiance to "rebut the copyright's presumptive validity." R.128 at 16. It explained that scenes a faire represents one exception to originality. *See Kohus*, 328 F.3d at 856. And it determined that the record failed to establish that any "requirements of insurance companies" or similar constraints dictated how Premier expressed the details of its plan. R.128 at 18. In the absence of that expert testimony or other expert evidence at summary judgment, it properly concluded this chain of reasoning by holding that Allegiance failed to rebut the presumption that Premier enjoys a valid copyright.

The concepts underlying scenes a faire and merger, we appreciate, sometimes bear on the threshold originality of the copyright and sometimes are best viewed through the lens of an affirmative defense. As in *Feist* itself, a court may treat these principles as crucial to the initial question of originality. 499 U.S. at 358 ("[T]he principal focus should be on whether the selection, coordination, and arrangement [of a fact-based work] are sufficiently original to merit protection."). At other times, it may make more sense to think about these doctrines as distinct underlying affirmative defenses to infringement, perhaps when an infringer copies only part of an original work. *See, e.g.*, *Kregos*, 937 F.2d at 705; *Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1082 (9th Cir. 2000). That a copyright concept may go to the validity of a copyright in the first instance does not preclude it from operating as a defense to infringement in other instances. *See Lexmark*, 387 F.3d at 537–39. As the Copyright Office itself recognizes, "scènes à faire cannot be registered by themselves," but works containing scenes a faire qualify for copyright registration "provided that the work as a whole contains a sufficient amount of original expression." U.S. Copyright Off., *Compendium of U.S. Copyright Office Practices* § 313.4(I) (3d ed. 2021); *see also id.* § 313.3(B) (listing examples where the Office "refuse[d] to register the claim" due to merger). Consider again the white pages. If that compilation consisted of nothing but a list of numbers, such an expected arrangement would not qualify as minimally creative in the first instance. *See Feist*, 499 U.S. at 363; *see also Southco, Inc. v. Kanebridge Corp.*, 390 F.3d 276, 288–89 (3d Cir. 2004) (Becker, J., concurring) ("The *scènes à faire* doctrine, therefore, dispels the notion that there was the requisite originality in [the

author's] selection of characteristics and values to merit copyright protection."). An author perhaps might obtain a valid copyright registration by tacking on original content to that compilation, such as a foreword. *Feist*, 499 U.S. at 361. But the resulting "thin" copyright would protect only those original additions from copying, not the listings themselves. *Id.* at 349; *cf. Atari Games Corp. v. Oman*, 888 F.2d 878, 886 (D.C. Cir. 1989) (Ginsburg, J.).

In this instance, any distinction between using scenes a faire as a threshold defense to originality or as an affirmative defense to infringement does not make a difference. Even the courts that treat scenes a faire only as an affirmative defense have cautioned that this doctrine still does not permit the infringer to produce work "virtually identical" to the original. *Incredible Techs., Inc. v. Virtual Techs., Inc.*, 400 F.3d 1007, 1014–15 (7th Cir. 2005); *see Apple Comput., Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1444, 1446–47 (9th Cir. 1994). No one denies that Allegiance's certificates copy Premier's certificate, save for a few minor points of contact information. No matter how a court understands the doctrine of scenes a faire, Allegiance still had to produce evidence that external constraints dictated how Premier created its certificate. *See RJ Control*, 981 F.3d at 458; *cf. Automated Sols. Corp. v. Paragon Data Sys., Inc.*, 756 F.3d 504, 520 (6th Cir. 2014). Allegiance did not offer any such evidence.

Allegiance, it is true, provided the district court with another company's forms that resemble Premier's certificates. But similarity by itself does not suffice to demonstrate scenes a faire. Expert testimony usually is needed to show that convention and the setting of the work constrained the author's choices. Confirming the point, similar works still receive copyright protection so long as they are original to the author and satisfy the minimal threshold of creativity. *Feist*, 499 U.S. at 345–46. Identical "stock or standard phrases" in the end give rise to scenes a faire only if they "necessarily follow from a common theme or setting." *RJ Control*, 981 F.3d at 458 (quoting *Lexmark*, 387 F.3d at 535).

The scattered similarities in parts of these forms, often due to their coverage of the same subject matter as opposed to a required convention, do not undermine their creative features. Consider an example that Allegiance identifies: the certificates' similarities and differences when it comes to service intervals. Yes, the wording of each one largely parallels the other given the imperative of covering a common subject—how often the owner must obtain service of the

car.  But Premier's form includes that language as part of a section on "eligibility" that offers multiple checkboxes for different mileage options.  R.100-1 at 3.  The other company, by contrast, expresses this condition as a take-it-or-leave-it "responsibility" without any mechanism for customization.  R.101-7 at 3.  The existence of such substantive variation within the industry undercuts Allegiance's claims that external constraints determined the content of Premier's certificates.  *See S. Credentialing*, 946 F.3d at 784.

There is another way, Allegiance adds, that external constraints limited Premier's expressiveness.  Insurance companies review the certificates and require the inclusion of "some language."  R.91-1 at 26.  But this reality does not show that insurers have deprived administrators of their flexibility when crafting loyalty certificates "as a whole."  *Lexmark*, 387 F.3d at 538.  Even legally compliant expressions of facts may possess the modest creativity needed to qualify as original.  As one court helpfully put the point:  "Although laws and hospital policies dictate the contents of the credentialing forms, Southern Credentialing's unique selection and arrangement of information exhibit creative expression."  *S. Credentialing*, 946 F.3d at 784; *see SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharms., Inc.*, 211 F.3d 21, 25, 29 (2d Cir. 2000).

Allegiance also offers testimony from a former Premier contractor who claimed that the company drew upon "decades of prior underwriting work" in choosing to "model[]" its certificate on other existing programs.  R.162-1 at 4.  And it refers to the report of an auto service and finance expert who explained that dealers often dictate identical language and coverage to administrators.  But Allegiance never introduced these sources into the summary judgment record.  It thus has forfeited the invocation of them today.  *See* Fed. R. Civ. P. 56(c).

Nor does it make a difference that Allegiance urged the district court to reconsider its summary judgment ruling on the basis of this new evidence.  The district court denied that motion because it raised new legal theories and new evidence that were both available at the time of summary judgment. Allegiance did not challenge the decision on appeal.

*Disgorgement.*  Even if Allegiance faces copyright liability, it claims that the district court miscalculated the profits from the infringement that Allegiance is required to disgorge.

A copyright owner may recover actual damages and "any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." 17 U.S.C. § 504(b). A burden-shifting process frames the lost-profits calculation. *ECIMOS, LLC v. Carrier Corp.*, 971 F.3d 616, 634 (6th Cir. 2020). The copyright owner initially must provide evidence of the infringer's gross revenue. *Id.* The gross-revenue calculation must bear a "reasonable relationship" or "relevance" to the infringement, but the plaintiff does not have to demonstrate strict causation. *Balsley v. LFP, Inc.*, 691 F.3d 747, 769 & n.6 (6th Cir. 2012). The revenue figures suffice if they correspond to the product containing the infringing work, such as a magazine that reprints a copyrighted image. *Id.* at 770.

Once the plaintiff makes this showing, the infringer must show what part of its gross revenues did not result from the infringement. *See ECIMOS*, 971 F.3d at 635. It may do so by offering proof of its "deductible expenses" as well as the "elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. § 504(b). The calculation of expenses and allocation of profits, no surprise, are fact driven. *See Bridgeport Music, Inc. v. Justin Combs Publ'g*, 507 F.3d 470, 484 (6th Cir. 2007). If "plausible evidence" supports a finding, we will not second guess it. *ECIMOS*, 971 F.3d at 637.

This statutory burden-shifting corresponds to the reality that the infringer usually possesses the information necessary to provide the victim a fair share of the profits. *See Singletary Constr., LLC v. Reda Home Builders, Inc.*, 815 F. App'x 892, 907 (6th Cir. 2020) (Murphy, J., concurring in part); *see also Sheldon v. Metro-Goldwyn Pictures Corp.*, 309 U.S. 390, 399, 408 (1940). Because the victim of infringement cannot readily extend its own experience to calculate the infringer's costs, the statute requires the infringer to account for its actual expenses. *See Thoroughbred Software Int'l, Inc. v. Dice Corp.*, 488 F.3d 352, 360–61 (6th Cir. 2007).

So too for the allocation of profits. Copyright plaintiffs may not always compete head-to-head with the infringer and so can fail to appreciate all the other inputs that contribute to gross revenues and profits. Once the plaintiff has identified a final product containing the infringing work, the statute assigns the burden of allocating profit to the infringer, who possesses every

incentive to identify as many alternative contributors to its profits as it can. *Cf. Sheldon*, 309 U.S. at 407–08.

The district court's disgorgement award hewed to this process. Premier, as an initial matter, met its burden of showing the gross revenues for Allegiance's infringement of the certificate. The certificates rest at the core of what Tricor hired Allegiance to do. They set forth the terms and conditions of the loyalty program, and car dealers enrolled buyers with Allegiance's administration system using the certificates to collect their registration information. Allegiance in turn received $40 Canadian every time a dealer issued a certificate to the buyer. As Premier's expert testified, his calculation of Allegiance's gross revenues came out "very close" to a back-of-the-envelope estimation that multiplies the number of loyalty certificates issued by $40 Canadian. R.255 at 32. The district court found that, after adjusting for exchange rates, Allegiance earned $1,279,280 from administering the Lifetime Powertrain Program between April 2018 and April 2022.

After that, the district court found that Allegiance could deduct $838,041 in costs, leaving a profit of $441,239. The court acknowledged that Allegiance thought that none of this profit could be attributed to the infringing certificates because it simply administered these plans for Tricor, the ultimate beneficiary of any infringement. But the court reasonably concluded that Allegiance's arguments did not satisfy its burden of showing its own profitability figures; they just went to Premier's showing of gross revenues. Because Allegiance failed to carry its burden of allocating profits, the court fairly required it to pay this amount. No clear error occurred.

Allegiance replies that this analysis confuses the "words on the [loyalty] Certificate[s]" with the "administration services" that Allegiance performed. Appellant's Br. 31–32. Because buyers do not review the certificate's text before enrolling in the program and do not enroll in the program before purchasing a car, Allegiance claims Premier failed to satisfy its burden of relating Allegiance's revenue from the loyalty program to its infringement of the certificates' text. *See* R.189-2 at 2 (stating in Allegiance's expert report that fees for administration relate to the "fair market value for the administration services" and not "the language or style of the form used"). But this argument asks too much of Premier. The statute places a low burden on the victim of the infringement to explain "why that [gross revenue] number is related to the

infringement" without requiring a "causal connection." *Balsley*, 691 F.3d at 769 n.6, 770 n.7. Any burden of proving causation instead falls on Allegiance, which must prove in the second phase of the burden-shifting framework how much of its profits stemmed from activity unrelated to the infringement. *Id.*

To our knowledge and to the knowledge of the parties, we have never required a plaintiff to limit gross revenues to the infringing expression. Few infringers will be so bold as to resell the infringed work by itself. Revenues from magazine sales reasonably relate to the inclusion of an infringing photograph, *id.* at 770–71, and revenues from a factory's output reasonably relate to quality-control software that end-consumers never use, *ECIMOS*, 971 F.3d at 623–25, 636. So too here. Allegiance sold administrative services to Tricor and received $40 Canadian in compensation each time a dealer issued a certificate. The gross revenue figures correspond to that income stream alone, excluding other products that Allegiance administered for Tricor. On this record, Premier had no obligation to refine its scope further. *See id.* at 636 (limiting revenues to single factory); *Balsley*, 691 F.3d at 770.

Allegiance claims that a few out-of-circuit district court cases have emphasized causation at the plaintiff's stage of the burden-shifting process. But they do not offer meaningful parallels to this case. One of them involved a pipe replacement company that infringed the copyrighted contract form of a rival firm. *Phx. Renovation Corp. v. Rodriguez*, 461 F. Supp. 2d 411, 414 (E.D. Va. 2006). The plaintiff calculated how much the infringer had earned from jobs that began by signing the contract. But the court declined to shift the burden as the plaintiff had not shown any customers hired the defendant because of that form. *Id.* at 421–23. In the second case, a bank infringed a copyrighted mortgage form. *Homeowner Options for Mass. Elders, Inc. v. Brookline Bancorp, Inc.*, No. 09-11790-NMG, 2012 WL 3136786, at *1–2 (D. Mass. July 31, 2012). Those cases both imposed a legal standard of causation higher than the relationship test that we have adopted. *Balsley,* 691 F.3d at 769 & n.6. No matter whether Premier has shown that car buyers, dealers, or Tricor contracted with Allegiance because it had copied Premier's expression, Premier satisfied its burden of establishing that Allegiance's revenues reasonably relate to its use of the certificate.

Shifting gears, Allegiance challenges the district court's factual findings about the operation of its program, claiming they are internally inconsistent. We disagree. The district court accurately described the "final product sold" by Allegiance as the Lifetime Powertrain Loyalty Program. R.241 at 6. Although it stated that the certificate was "not part of the final product sold," it accurately explained that Allegiance "used [the certificate] to administer the program" and that the certificate formed "one small part of the final product" akin to other inputs that never reach the ultimate consumer. *Id.*; *cf. ECIMOS*, 971 F.3d at 636.

Allegiance adds that the findings lack specificity because the district court did not cite trial evidence about how this program operated or about Allegiance's role in it. Not so. All that the court needed to do was find facts sufficient to give us an "understanding of the basis" for its decision, and we may assume the district court drew reasonable inferences from its findings. *Solis v. Laurelbrook Sanitarium & Sch., Inc.*, 642 F.3d 518, 530 (6th Cir. 2011) (quotation omitted). The court's orders met these modest requirements.

*Attorney's fees*. Allegiance challenges the district court's award of statutory attorney's fees to Premier. We review that decision for an abuse of discretion. *Balsley*, 691 F.3d at 771.

Under copyright law, a district court "in its discretion may allow the recovery of full costs," which includes "a reasonable attorney's fee to the prevailing party." 17 U.S.C. § 505. District courts determine whether to do so based on the totality of the circumstances: the unreasonableness of the infringement, the unreasonableness of any litigation behavior, the need to deter future infringement, the frivolity or not of the lawsuit, and any suspect motivations in defending the challenge. *See Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 n.19 (1994).

The district court did not abuse its discretion in awarding these fees. In considering Allegiance's litigation position, the court found that its arguments about the infringer's burden in disgorgement calculations unreasonably ignored our precedent, and it found unreasonable Allegiance's "late hour" challenges to the summary judgment decision. R.266 at 13–15. The court then concluded that the goal of deterrence also supported a fee award given that Allegiance had continued to profit from Premier's copyright even after the summary judgment, and the company suggested that it would continue to do so absent a permanent injunction.

Allegiance claims that the district court could not rely on the rationale of deterrence once it enjoined Allegiance from infringing this copyright. But the Supreme Court declined to endorse all-or-nothing approaches to deterrence when it observed that courts must consider this factor "in particular circumstances." *Fogerty*, 510 U.S. at 534 n.19. A case-by-case approach makes considerable sense in the equitable setting of injunctions. The district court had a legitimate basis to believe that an injunction by itself would not deter Allegiance from continuing to infringe on Premier's certificate. Allegiance had continued to infringe on the certificate during the litigation and had suggested that it would keep doing so.

Allegiance adds that the district court erred by finding that Allegiance took an unreasonable position on disgorgement. But the case law explains that plaintiffs possess a burden only to show a reasonable relationship between infringement and gross revenues. *Balsley*, 691 F.3d at 769. A district court does not abuse its discretion in characterizing as unreasonable arguments that are contrary to settled law. *See Coles v. Wonder*, 283 F.3d 798, 803–04 (6th Cir. 2002). Nor was that finding clearly erroneous. Allegiance supports its claim about ambiguous precedent with a single district court opinion. Yet even that opinion correctly explained that the plaintiff could "not establish that the revenues are reasonably related to infringement." *Satija v. Permanent Gen. Assurance Corp. of Ohio*, No. 1:13-CV-00082, 2014 WL 1514240, at *5 (N.D. Ohio Apr. 16, 2014).

Allegiance claims that the court erred when it described several of Allegiance's motions as unreasonable because they were untimely and amounted to thinly veiled attempts to relitigate summary judgment. Because the district court had a ring-side seat to the parties' litigation strategies and positions, we will not lightly disturb its discretion in this area. *See Bridgeport Music, Inc. v. Dimension Films*, 410 F.3d 792, 809–10 (6th Cir. 2005) (amended opinion). Allegiance gives no reason why we should second guess the district court's determination that Allegiance needlessly delayed filing its motion for reconsideration.

We affirm.

Appendix A.  Premier's Copyrighted Certificate

## LIFETIME POWERTRAIN PROGRAM
### LOYALTY CERTIFICATE

CERTIFICATE REGISTRATION#

LTPTR1-01-

### SECTION 1 - CUSTOMER INFORMATION → ("You or Your")

| LAST NAME | FIRST NAME | M.I. |
|---|---|---|
| CO-OWNER LAST NAME | FIRST NAME | M.I. |
| ADDRESS | | EMAIL ADDRESS |

| CITY | STATE | ZIP | TELEPHONE |
|---|---|---|---|

### SECTION 2 - DEALER INFORMATION → ("We, Us, or Our")

DEALER NAME

| CITY | STATE | ZIP | TELEPHONE |
|---|---|---|---|

### SECTION 3 – VEHICLE AND CERTIFICATE INFORMATION

| VIN | YEAR | MAKE | | MODEL |
|---|---|---|---|---|

☐ NEW VEHICLE
☐ PRE-OWNED VEHICLE

| VEHICLE PURCHASE DATE | CURRENT ODOMETER | **DEDUCTIBLE - $100** |
|---|---|---|

### SECTION 4 - COVERED PARTS

**Drive Axle** – All internally lubricated parts; Gear Cases and Housings if damaged as the result of a mechanical failure to an internally lubricated part; Axle Shafts and Bearings; C.V. and Universal Joints; Propeller Shafts; 4WD Actuator.

**Transmission/Transfer Case** – All internally lubricated parts; Gear Cases and Housing if damaged as the result of a mechanical failure to an internally lubricated part; Torque Converter; Flywheel/Flexplate; Vacuum Modulator Valve; TV Cable; Mounts; Oil Pan; TCM; Solenoids; Cooler and Metal Cooler Lines.

**Engine** – All internally lubricated parts; Engine Block, Cylinder Head(s) if damaged as a result of a mechanical failure to an internally lubricated part and Intake/Exhaust Manifolds; Mounts; Expansion Plugs; Pulleys; Harmonic Balancer; Oil Pan; Timing Chain Cover; Valve Cover(s); Water Pump; Thermostat and Thermostat Housing.

**Turbocharger/Supercharger (Factory Installed Only)** - All internally lubricated parts including: Turbine; Turbine Shaft; Valves; Vanes and Housing if damaged as the result of a mechanical failure to an internally lubricated part.

### SECTION 5 – ELIGIBILITY

**MAINTENANCE REQUIREMENTS FOR NEW VEHICLES** - In order to maintain **Your** reward eligibility under this Loyalty Certificate, **You** are required to have all the vehicle manufacturer recommended oil and filter changes, transmission fluid changes and tire rotations performed at **Our** service department. Maintenance services must be performed within 1,000 miles of the manufacturer recommended Service Intervals. For a list of manufacturer recommended maintenance services and Service Intervals, consult **Your** vehicle owner's manual. If **Your** vehicle is equipped with a "Maintenance Minder," "Oil Life Monitoring System," or other manufacturer engine service monitoring systems, then **You** must have **Your** oil changes and tire rotations performed at least every 7,500 miles.

| **MAINTENANCE REQUIREMENTS FOR PRE-OWNED VEHICLES** - In order to maintain **Your** reward eligibility under this Loyalty Certificate, **You** are required to have **Your** oil and filter changed and **Your** tires rotated at the Service Intervals shown to the right, at **Our** service department. **You** must have all maintenance services performed within **1,000** miles of the required Service Intervals. **You** also must have **Your** transmission fluid changed within 1,000 miles of the manufacturer recommended Service Intervals for **Your** vehicle at **Our** service Department. "Factory" refers to the manufacturer's maintenance schedule. Please refer to the eligibility section for new vehicles above for more information on the manufacturer's maintenance schedule. If the applicable pre-owned vehicle service intervals are not marked, then the 3,000 mile oil/filter change and the 6,000 mile tire rotation service intervals shall apply. | **OIL AND FILTER CHANGE SERVICE INTERVAL** |
|---|---|

| | |
|---|---|
| | ☐3,000 Miles    ☐3,750 Miles    ☐5,000 Miles    ☐Factory |
| | **TIRE ROTATION SERVICE INTERVAL** |
| | ☐6,000 Miles    ☐7,500 Miles    ☐5,000 Miles    ☐Factory |

**OTHER REQUIREMENTS** - **Your** compliance with the maintenance requirements will be audited by **Us** through **Our** service records. Upon **Our** request, **We** reserve the right to require **You** to provide **Us** with proof that the Maintenance Requirements have been met. In addition to the Maintenance Requirements outlined above, within 180 days after the 10 year anniversary of the VEHICLE PURCHASE DATE, and every 5 years thereafter (within 180 days), **You** are required to log on to the following website at **www.lifetimevehiclereg.com** to confirm that **You** (a) still own the vehicle; and (b) **You** have maintained **Your** vehicle as required. If **You** are unable to log on to **Our** website, **You** may submit **Your** confirmation by certified mail to the following address: Confirmation Dept. PO BOX 232437, San Diego, CA, 92193-2437.

### SECTION 6 - IMPORTANT INFORMATION ABOUT THE LIFETIME POWERTRAIN LOYALTY PROGRAM

1. This Loyalty Certificate entitles **You** to participate in the Lifetime Powertrain Loyalty Program. **Your** participation in the Lifetime Powertrain Loyalty Program is voluntary. **This Loyalty Certificate is not a product warranty nor is it a service contract.** **We** are providing this Loyalty Certificate to **You** at no cost.

2. The term "Service Interval" refers to the amount of miles that elapses between the performance of maintenance services. The Maintenance Requirements under this Loyalty Certificate require services be performed within 1,000 miles (plus or minus) of the required Service Interval as specified in **SECTION 5 - ELIGIBILITY**.

3. To qualify for rewards under this Loyalty Certificate **You** must maintain **Your** vehicle as described in **SECTION 5 - ELIGIBILITY**. Then, subject to the terms and conditions listed herein and **Your** payment of the deductible (if applicable), **We** will repair, replace, or have repaired or replaced any covered part which fails to perform the function for which it was intended to perform, within manufacturer specifications, due to a mechanical or electrical defect. Replacement may be made with a part which is of like kind and quality comparable with the original design specifications and wear tolerances of the vehicle. Coverage is limited to the covered parts listed above. Normal wear and tear or physical damage is not covered.

4. To initiate a claim for rewards under this Loyalty Certificate, **You** must bring the vehicle and this Loyalty Certificate to **Our** service facility.

5. This Loyalty Certificate applies to **You** only and only to the vehicle described above. This Loyalty Certificate cannot be transferred to any other person including any subsequent owners of the vehicle.

6. **You** must maintain record of all maintenance services performed. If **You** fail to maintain **Your** vehicle in accordance with the Maintenance Requirements or to confirm **Your** continued ownership of the vehicle (both as described in **SECTION 5 - ELIGIBILITY** above) then this Loyalty Certificate shall become void and **Your** vehicle will no longer be eligible for repairs under this Loyalty Certificate. **You** should maintain records of all maintenance services performed by **Us**.

By **Your** signature below, **You** acknowledge that **You** been given the opportunity to read the entire Loyalty Certificate and understand the terms, conditions and exclusions governing the Lifetime Powertrain Loyalty Program. **You** further acknowledge that **You** will be responsible for the deductible amount (if applicable) indicated in **SECTION 3** above.

CUSTOMER SIGNATURE: _____ DATE: _____

CO-OWNER SIGNATURE: _____ DATE: _____

DEALER AUTHORIZED SIGNATURE: _____ DATE: _____

WHITE - ADMINISTRATOR     YELLOW - CUSTOMER     PINK - DEALER

Page 1 of 2

LTPTR1-01 (4/12)

**SECTION 7 - EXCLUSIONS**

This Loyalty Certificate does NOT provide coverage for any of the following:

1. Defects or repair problems that result from collision, abuse, misuse or negligence. Defects or repair problems that result from lack of adequate maintenance after **You** bought the vehicle.
2. Repair or replacement of a covered part if the repair or replacement is covered by the repairer's warranty, the manufacturer's new car warranty, an extended service contract provider, or if the manufacturer otherwise agrees to repair or replace the part.
3. Repair or replacement of a covered part if the damage was caused by the failure of a non-covered part.
4. Replacement of maintenance items (such as spark plugs, ignition points, positive crankcase ventilator valve, filters, lubricants and oil, electrical items) made in connection with normal maintenance services.
5. Damage caused by **Your** failure to take or cause to be taken, reasonable precautions to prevent damage when an apparent problem exists (e.g. change in engine temperature condition, unusual noises, leaking fluids, shaking, unusual shifting, etc.).
6. Damage caused by the lack of proper and/or necessary amounts of coolants or lubricants or caused by sludge buildup, contaminant(s), or foreign object(s).
7. Replacement of or repairs to parts of the vehicle not listed on this Loyalty Certificate as covered parts.
8. Gradual reduction in operating performance due to normal wear and tear (the natural and inherent wear characteristics of automotive parts) and not resulting from the failure of a covered part.
9. Oil loss or use not resulting from the failure of a covered part.
10. Failure of any part if the odometer is inoperative or has been tampered with or has been disconnected subsequent to **Your** purchase of the vehicle.
11. Fluids, seals and gaskets unless required in connection with the repair or replacement of a covered part.
12. Vehicles used for commercial purposes including but not limited to construction purposes, delivery purposes, commercial towing, commercial farm operation, volunteer public service(s), snow plowing, rental, livery, taxi, any type of emergency vehicle, or competitive or off road racing.
13. Repair or replacement to any part if **You** have not maintained **Your** eligibility under the Lifetime Powertrain Loyalty Program.
14. Repair or replacement of hybrid or electric vehicle specific components.
15. Repair or replacement of any part if the vehicle's powertrain components, exhaust system or suspension system have been modified in any manner not approved by the manufacturer.
16. Damage caused by accident, civil commotion or riot, nuclear contamination, collision or upset, glass breakage, earthquake, explosion, falling objects, fire or smoke, flood, fluid contamination, freezing, hail, lightning, malicious mischief, fuel contamination, oil contamination, rust, corrosion or electrolysis, theft or larceny, vandalism, water, water contamination, windstorm and other external forces or events.

**SECTION 8 - LIMITS OF LIABILITY**

1. 90 days and 3,000 miles must elapse from the odometer reading at the date of Loyalty Certificate issuance to be eligible for repair. Failures that occur within the first 90 days and 3,000 miles are not covered.
2. The total amount payable for any single incident of repair and/or replacement shall not exceed the actual cash value of the vehicle immediately prior to the breakdown. This determination will be made using the average trade-in value from the most recent National Automobile Dealers Association (NADA) guide.

**SECTION 9 - SUBSTITUTE TRANSPORTATION**

If **Your** vehicle is undergoing repairs covered by this Loyalty Certificate, then **We** will reimburse **You** for actual substitute transportation expenses incurred up to forty dollars ($40.00) per day for each day **Your** vehicle is undergoing covered repairs for a maximum of five (5) days per occurrence. Reimbursement for substitute transportation shall not continue beyond the day on which the repairs are completed and/or the day that **You** are notified of the completion of the repair. To receive reimbursement, **You** must submit receipts from a licensed rental agency to **Us**. The total benefit per occurrence shall not exceed two hundred dollars ($200.00).

Appendix B.  Allegiance's Certificate

**LIFETIME POWERTRAIN LOYALTY PROGRAM**
**LOYALTY CERTIFICATE**

CERTIFICATE REGISTRATION NO.

**SECTION 1   DEALER INFORMATION → ("We, Us, or Our")**

DEALER NAME (INCLUDING LEGAL NAME, IF DIFFERENT) MYERS ORLEANS NISSAN

DEALER REGISTRATION # 833255516RT0

| CITY | PROVINCE | POSTAL CODE | TELEPHONE |
|---|---|---|---|
| ORLEANS | ON | K1C 2X8 | 613-824-8550 |

**SECTION 2   CONSUMER INFORMATION → ("You or Your")**

CONSUMER (LAST, FIRST, M.)    FAUVEL, NATHALIE

CO-BUYER (LAST, FIRST, M.)

ADDRESS    17 BURNDALE RD          EMAIL

| CITY | PROVINCE | POSTAL CODE | TELEPHONE |
|---|---|---|---|
| ORLEANS | ON | K1B 3Y4 | 613-240-7184 |

**SECTION 3   VEHICLE AND CERTIFICATE INFORMATION**

| VIN 5N1AT2MV4JC767584 | YEAR 2018 | MAKE NISSAN | MODEL ROGUE |
|---|---|---|---|

| ■ NEW ☐ USED | VEHICLE PURCHASE DATE 06/01/2018 | CURRENT ODOMETER 50 | DEDUCTIBLE $200.00 |
|---|---|---|---|

**SECTION 4   COVERED PARTS**

Drive Axle – All internally lubricated parts; Gear Cases and Housings if damaged as the result of a mechanical failure to an internally lubricated part; Axle Shafts and Bearings; C.V. and Universal Joints; Propeller Shafts. Transmission/Transfer Case – All internally lubricated parts; Gear Cases and Housing if damaged as the result of a mechanical failure to an internally lubricated part; Torque Converter; Vacuum Modulator Valve. Engine – All internally lubricated parts; Engine Block, Heads and Intake/Exhaust Manifolds if damaged as a result of a mechanical failure to an internally lubricated part; Water Pump; Thermostat and Thermostat Housing.

**SECTION 5   ELIGIBILITY**

MAINTENANCE REQUIREMENTS FOR NEW VEHICLES - In order to maintain Your eligibility for rewards under this Loyalty Certificate, You are required to have all of the manufacturer required and recommended maintenance services performed at Our service department or the service department of any Tricor dealership. Your owner's manual lists different servicing recommendations based on Your individual driving habits and climate conditions. You are required to follow the normal or severe maintenance schedule that applies to Your driving habits and conditions. Go to www.tricorauto.com for a list of authorized Tricor dealerships. Maintenance services must be performed within 1,500 kilometres of the manufacturer recommended Service Intervals. For a list of manufacturer required and recommended maintenance services and Service Intervals, consult Your vehicle owner's manual. If Your vehicle is equipped with a "Maintenance Minder," "Oil Life Monitoring System," or other manufacturer engine service monitoring systems, then You must have Your oil changes and tire rotations performed at least every 12,000 kilometres.

| | |
|---|---|
| MAINTENANCE REQUIREMENTS FOR PRE-OWNED VEHICLES - In order to maintain Your eligibility for rewards under this Loyalty Certificate, You are required to have Your oil and filter changed and Your tires rotated at the Service Intervals shown to the right, at Our service department or the service department of any Tricor dealership. In addition, You are required to perform all other manufacturer required and recommended procedures at Our service department or the service department of any Tricor dealership.  Go to www.tricorauto.com for a list of authorized Tricor dealerships. You must have all maintenance services performed within 1,500 kilometres of the manufacturer recommended Service Intervals. "Factory" refers to the manufacturer's maintenance schedule. If Your vehicle is equipped with a "Maintenance Minder", "Oil Life Monitoring System", or other manufacturer engine service monitoring system, then You must have Your oil changes and tire rotations performed at least every 12,000 kilometres.  If the Service Intervals are not marked, then the default intervals shall be 5,000 kilometres for the oil and filter change and 10,000 kilometres for the tire rotation. | OIL AND FILTER CHANGE SERVICE INTERVAL ☒ FACTORY  TIRE ROTATION SERVICE INTERVAL ☒ FACTORY |

OTHER REQUIREMENTS - Your compliance with the maintenance requirements will be audited by Us through Our service records.  Upon Our request, We reserve the right to require You to provide Us with proof that the maintenance requirements have been met.  In addition to the maintenance requirements outlined above, within 90 days after the 10 year anniversary of the VEHICLE PURCHASE DATE, and every 5 years thereafter (within 90 days), You are required to confirm that You (a) still own the vehicle; and (b) You have maintained Your vehicle as required.  You may submit Your confirmation by certified mail to the following address: Confirmation Dept. PO BOX 2082, Dublin, OH, 43017, USA.

**SECTION 6   IMPORTANT INFORMATION ABOUT THIS LOYALTY CERTIFICATE**

1.  This Loyalty Certificate entitles You to participate in the Lifetime Powertrain Loyalty Program. Your participation in the Lifetime Powertrain Loyalty Program is voluntary. This Loyalty Certificate is not a product warranty nor is it a service contract.  We are providing this Loyalty Certificate to You at no cost. This Loyalty Certificate applies only to You and only to the vehicle described above. This Loyalty Certificate cannot be transferred to any other person including any subsequent owners of the vehicle.

2.  The term "Service Interval" refers to the amount of kilometres that elapses between the performance of maintenance services. The maintenance required under this Loyalty Certificate must be performed within 1,500 kilometres (plus or minus) of the required Service Interval as specified in SECTION 5 - ELIGIBILITY.

3.  If You must maintain Your vehicle as described in SECTION 5 – ELIGIBILITY, then subject to the terms and conditions listed herein and Your payment of the deductible, We will repair, replace, or have repaired or replaced any covered part which fails to perform the function for which it was intended to perform, within manufacturer specifications, due to a mechanical or electrical defect. Replacement may be made with a part which is of like kind and quality comparable with the original design specifications and wear tolerances of the vehicle. Coverage is limited to the covered parts listed above.

4.  You must maintain records of all maintenance services performed.  If You fail to maintain Your vehicle in accordance with the maintenance requirements or to confirm Your continued ownership of the vehicle (both as described in SECTION 5 - ELIGIBILITY above) then this Loyalty Certificate shall become void and Your vehicle will no longer be eligible for repairs under this Loyalty Certificate.

5.  Our obligations under this Loyalty Certificate are insured by Industrial Alliance General Insurance Corporation.

6.  By Your signature below, You acknowledge that You been given the opportunity to read this entire Loyalty Certificate (pages 1 and 2) and understand the terms, conditions and exclusions governing the Lifetime Powertrain Loyalty Program. You further acknowledge that You will be responsible for the deductible amount indicated above.

**EXHIBIT 2**

| | |
|---|---|
| CONSUMER SIGNATURE: | DATE: 06/01/2018 |
| CO-BUYER  SIGNATURE: | DATE: 06/01/2018 |
| SALES PERSON NAME AND REGISTRATION NO.: MARC ANDRE LEBLANC    0488068 | SALES PERSON SIGNATURE: |
| DEALER AUTHORIZED SIGNATURE(S): | DATE: 06/01/2018 |

**Exhibit B**
ILTPT-MY (4/18)

Appendix C.  Comparison Certificate



# Engine for Life Limited Warranty
### For the Anderson Automotive Group
### By Heritage

| WARRANTY HOLDER (CUSTOMER INFORMATION) | APPLICATION/WARRANTY NO: |
|---|---|
| Name: | Current Odometer: |
| Address: | Vehicle Purchase Date |
| City, ST, Zip: | |
| Phone #: | |

| COVERED VEHICLE | DEALERSHIP |
|---|---|
| VIN: | Name: |
| Year: | Address: |
| Make: | |
| Model: | City, ST, Zip: |

I HAVE READ AND UNDERSTAND THIS LIMITED WARRANTY IN ITS ENTIRETY. I ACKNOWLEDGE MY UNDERSTANDING THAT IT IS ISSUED BY THE ISSUING DEALER FOR THE LIFE OF THE ABOVE INDICATED VEHICLE TO THE ABOVE INDICATED ORIGINAL OWNER OF THIS VEHICLE AT TIME OF SALE.

To obtain the benefits provided under this warranty it is the responsibility of the Original Registered Owner to:

- Must have the engine serviced at the selling Dealership the vehicle was purchased from, or this warranty will be void.
- Maintain purchase/service receipts evidencing the engine has been serviced.
- Assure that engine oil and filter are changed every three (3) months or three-thousand (3,000) miles, whichever occurs first or as recommended by the manufacturer.
- Warranty holder must follow this maintenance requirement for coverage to be in effect.
- Replace leaking engine or coolant seals and gaskets.

Customer Signature _____      Date _____      Dealership Signature _____

### DEFINITIONS
- "Breakdown" or "Mechanical Breakdown" means the immediate & apparent total failure of any Covered Part to work as it was designed to work in normal service. Please refer to the wording under exclusions for a listing of conditions under which the failure of a Covered Part is not considered a Mechanical Breakdown.
- "Warranty Holder" means the holder of this limited warranty.
- "Covered Part" means any part of the vehicle listed under the section of this limited warranty entitled *What Is Covered* and not excluded from coverage as per the section of this limited warranty entitled *Exclusions – What This Limited Warranty Does Not Cover.*
- "Repair Facility" means any original Selling Dealer or Heritage Authorized Repair Facility at which the Warranty Holder acquires service under this limited warranty.
- "Claim Administrator" means Heritage Administration Services, Inc., located at 6055 "O" Street, Lincoln, Nebraska 68510, and which can be reached at 1-800-753-5236.

### WARRANTY HOLDER OBLIGATIONS
- The Warranty Holder and the Repair Facility are required to obtain the Claim Administrator's authorization number prior to beginning any repair covered by this limited warranty.
- The Warranty Holder is responsible for authorizing and paying for any tear down or diagnosis time needed to determine if the vehicle has a covered Breakdown. If it is subsequently determined that the repair is needed due to a covered Breakdown then the Claim Administrator will pay for such tear down or diagnosis. If the failure is not a covered Mechanical Breakdown then the Warranty Holder is responsible for payment of such tear down or diagnosis.

**NO CLAIMS WILL BE PAID WITHOUT PRIOR AUTHORIZATION**
**CLAIMS 1-800-753-5236**

F61203

TLW-AAG-TP-021203

1 of 2

ALL - 001085

## CLAIM ADMINISTRATOR OBLIGATIONS

If a covered Mechanical Breakdown of the vehicle occurs during the term of this limited warranty and within the United States or Canada the Claim Administrator will:

- Pay the Selling Dealer or the Authorized Repair Facility for repair or replacement, as the Claim Administrator deems appropriate, of the Covered Part(s) which caused the Mechanical Breakdown if the Warranty Holder has met his/her obligations as described in this limited warranty and if the Breakdown is not excluded under the exclusions section of this limited warranty. Replacement parts can be of like kind and quality. This may include the use of new, remanufactured or comparable parts as determined by the Claim Administrator.
- Reimburse the Warranty Holder for a rental car. Required labor time is determined by the national repair manual in use by the Repair Facility. If the Claim Administrator requests that the vehicle be inspected by an outside source, the Claim Administrator will reimburse the Warranty Holder for 1 day of rental. To receive rental benefits, Warranty Holder must supply the Claim Administrator with the receipt from a licensed rental agency, Inc. One day rental is allowed for parts delay, inspection of breakdown, and/or 4 hours to do repairs. An additional day of rental will be authorized for every additional 8 hours of labor time charged to do the repairs. TO RECEIVE RENTAL BENEFITS THE CONTRACT HOLDER MUST SUPPLY HERITAGE ADMINISTRATION SERVICES, INC. WITH HIS/HER RECEIPT FROM A LICENSED RENTAL AGENCY. The limit on his reimbursement is up to $25 per day for up to 6 days per Mechanical Breakdown or series of Breakdowns related in time or cause.

## WHAT TO DO IF YOU HAVE A BREAKDOWN

(1) Use all reasonable means to protect the vehicle from further damage. This may require you to stop the vehicle, turn off the engine, and have the vehicle towed.
(2) You must Present this limited warranty back to the original selling Dealer or authorized repair facility for all engine problems, call the Claim Administrator, Heritage Administration Services, Inc. toll free at 1-800-753-5236, and fax any required maintenance receipts. Heritage Administration Services, Inc. can be reached through the mail at 8055 "O" Street, Lincoln, Nebraska 68510.
(3) Prior to proceeding with repairs, ensure the Repair Facility calls the Claim Administrator with an estimate of repairs and receives an authorization number from the Claim Administrator.

## COVERED PARTS

The following is a list of Covered Parts under this Warranty (Taxes and fluids needed for authorized repairs are also included).

Engine – All internally lubricated parts of engine, including: pistons, piston rings, piston pins, crankshaft an main bearings, connecting rods and rod bearing, camshaft and camshaft bearings, timing chain and timing gears, intake and exhaust valves, valve springs, guides, oil pump, push rods, rocker arms, hydraulic lifters and rocker arm shafts. The Engine Block and Cylinder Heads are also covered if mechanical failure was caused by the above-listed parts. (Does not include any other part other than what is supplied in Long Block Assembly).

## DURATION OF THIS WARRANTY

This warranty lasts for as long as you own the Covered Vehicle. Coverage under this warranty terminates if you sell or transfer the Covered Vehicle. This warranty is not transferable.

## EXCLUSIONS – WHAT THIS LIMITED WARRANTY DOES NOT COVER

- Dealer and Claim Administrator reserve the right to cancel this limited warranty and will not pay for Mechanical Breakdown if the odometer fails, or for any reason does not record the actual mileage of the vehicle after purchase date and the actual mileage of the vehicle cannot be established for verification of maintenance.

This warranty does not cover the following:

- A Breakdown caused by contamination of or lack of proper fuels, fluids, coolants, or lubricants.
- A Breakdown caused by a failure to replace seals or gaskets or otherwise to perform proper maintenance of the Covered Vehicle in a timely manner.
- A Breakdown caused by unauthorized modifications or alterations of a Covered Part, installation of performance accessories to the engine, or unauthorized repairs or replacements of Covered Parts performed in a faulty manner.
- A Breakdown caused by overheating, rust, or corrosion.
- A Breakdown caused by pre-ignition detonation, pinging, improper lubricants or improper engine adjustments.
- A Breakdown caused by collision, fire, electrical fire or meltdown, theft, freezing, vandalism, flood, or for any hazard insurable under standard physical damage insurance policies whether or not such insurance is in force with respect to the vehicle.
- Loss of use, loss of time, loss of profits or savings, inconvenience, commercial loss, property damage, bodily injury, punitive damages, and any incidental or consequential damages or loss of any kind that results from a Breakdown. Some states do not allow the exclusion or limitation of incidental or consequential damages, so the above exclusions or limitations may not apply to you.
- Any costs or other benefit for which the manufacturer has assumed its responsibility through any means including public recalls or factory service bulletins.
- A gradual reduction in operating performance due to normal wear and tear, such as guides, valves, rings and loss of compression.
- Seals and gaskets are not covered unless required in the repair of a Covered Part.
- Repairs covered by the original manufacturer's warranty, provided such warranty has been transferred to you.
- The costs associated with the tear down or diagnosis of a potential Breakdown, unless it is subsequently determined that a Breakdown covered by this warranty has occurred.
- Dealer and Claim Administrator reserve the right to cancel this limited warranty and will not pay for Mechanical Breakdown if the odometer fails, or for any reason does not record the actual mileage of the vehicle after purchase date and the actual mileage of the vehicle cannot be established for verification of maintenance.

## OTHER IMPORTANT WARRANTY PROVISIONS

The issuing dealer's obligation to perform under this limited warranty is insured by Heritage Warranty Insurance Risk Retention Group, Inc., 8055 "O" Street Lincoln, NE 68510. The aggregate total of dealer's and Claim Administrator's liability for all benefits paid or payable during the term of this limited warranty shall not exceed the average retail value of the vehicle. Heritage Warranty reserves the right, to purchase vehicle if the cost of the covered repair exceeds the value of the vehicle according to current National Auto Dealers Association standards at the time of Breakdown. This warranty is not transferable.

**NO CLAIMS WILL BE PAID WITHOUT PRIOR AUTHORIZATION**
**CLAIMS 1-800-753-5236**

Fo1203                                                                 TLW-AAG-TP-021203

1 of 2

ALL - 001086